UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
ALLY FINANCIAL INC., *et al.*,

|  |  |
|---|---|
| **Plaintiffs,** | **REPORT AND RECOMMENDATION** |
| -against- | 20-CV-1281 (MKB) (RLM) |
| **COMFORT AUTO GROUP NY LLC**, *et al.*, | |
| **Defendants.** | |

-----------------------------------------------------------------------------x

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

Ally Financial Inc. and Ally Bank (collectively, the "Ally Parties" or "plaintiffs") filed this diversity action against Comfort Auto Group NY LLC ("Comfort"), Route 206 Auto Group, LLC ("Route 206"), and Heshy Gottdiener ("Gottdiener") (collectively, "defendants"), alleging claims arising out of defendants' default on multiple commercial loans and floor financing agreements intended to finance the operation of two automobile dealerships. See generally Amended Complaint (May 8, 2020) ("Am. Compl."), Electronic Case Filing ("ECF") Docket Entry ("DE") #9. Despite initially participating in the litigation, defendants later abandoned their defense of the case and ignored their discovery obligations and court orders. As a result, the Honorable Margo K. Brodie, the District Judge assigned to the case, imposed sanctions on defendants, including striking defendants' answer and entering a default against each of them. See generally Order Adopting Report and Recommendations (Jan. 6, 2022) ("1/6/22 Order"), DE #80.

Following the entry of default against defendants, plaintiffs requested, without any supporting documentation, that the Court enter judgment against defendants in the amount of

$12,194,811.09.  See generally Proposed Judgment dated Jan. 20, 2022 (Jan. 20, 2022)

("1/20/22 Proposed Judgment"), DE #81.  Because plaintiffs' Amended Complaint—the

operative pleading in this case—did not seek a sum certain, Judge Brodie declined to enter

plaintiffs' proposed judgment and instead referred the matter to the undersigned magistrate

judge for an inquest on damages and attorneys' fees.  See Order Referring Matter (Jan. 24,

2022) ("1/24/22 Referral Order").  For the reasons that follow, this Court recommends that

plaintiffs' request for damages and attorneys' fees be granted in part.

**BACKGROUND**

I.    **Underlying Facts**[1]

Ally Financial Inc. is a bank holding company that is incorporated in Delaware and

headquartered in Detroit, Michigan.  See Am. Compl. ¶ 1.  The second plaintiff, Ally Bank, is

a commercial bank that maintains a principal place of business in Sandy, Utah.  See id. ¶ 2.

The individually named defendant, Gottdiener, is a New York resident and the owner of the

entity defendants, Comfort and Route 206.[2]  See id. ¶ 5.  Defendant Comfort is a limited

liability company based in Brooklyn, New York, where it operates an automobile dealership

known as the Chrysler Dodge Jeep Ram Fiat of Bay Ridge (the "NY Dealership").  See id. ¶¶

---

[1] As discussed infra, these well-pleaded allegations are deemed admitted by virtue of the default entered against defendants as a sanction by the District Court.  See Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc., 702 F.Supp.2d 104, 111 (E.D.N.Y. 2010) ("A defendant's default is an admission of all well-pleaded factual allegations in the complaint except those relating to damages." (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992))).

[2] The record reflects that Gottdiener signed the financing agreements between the parties (as discussed in this opinion) on behalf of Comfort and Route 206.  See, e.g., Comfort Inventory Financing and Security Agreement (docketed on Feb. 28, 2022) ("Comfort IFSA") at 22, DE #84-3 (showing Gottdiener's name and signature under Comfort's signature line).  The Court therefore makes the reasonable inference that Gottdiener is the owner of these two dealerships.  This inference is further supported by plaintiffs' assertion that Gottdiener proposed to plaintiffs the purchase of "an additional Kia dealership[,]" which implies that Gottdiener is also the owner of the Kia dealership operated by Route 206.  See Declaration of Michael Keeler, Executive Director of Ally Bank (Feb. 28, 2022) ("Keeler Decl.") ¶ 74, DE #84-2 (emphasis added).

2

3, 9.  Defendant Route 206 is a limited liability company that maintains its principal place of business in Newton, New Jersey; Route 206 also operates an automobile dealership, the Kia of Sussex (the "NJ Dealership").  See id. ¶¶ 4, 37.

### A.      Comfort's Financing Agreements

On September 6, 2017, Comfort entered into an Inventory Financing and Security Agreement with plaintiffs (the "Comfort IFSA"), pursuant to which plaintiffs "agreed to provide Comfort with wholesale inventory floorplan finance accommodations in the form of an inventory financing line of credit to acquire new and used vehicles for the principal purpose of selling or leasing them to retail customers[.]"  Id. ¶ 10; see generally Comfort IFSA, DE #84-3.  Unlike a conventional credit line, a floorplan financing line of credit allows plaintiffs to "make principal advances on a vehicle-by-vehicle basis as each vehicle is acquired by [Comfort]."  Supplemental Declaration of Michael Keeler, Executive Director of Ally Bank (June 21, 2022) ("Keeler Supp. Decl.") ¶ 14, DE #95.  The maximum amount of credit available under the Comfort IFSA is $20,440,000, subject to modification.  See Comfort IFSA § III.A.2, DE #84-3.

"[F]loorplan financing is generally interest-only financing until a vehicle is sold."  Keeler Supp. Decl. ¶ 19, DE #95.  As such, under the Comfort IFSA, until a vehicle is sold, Comfort is required to make regular interest-only monthly payments to plaintiffs, with "interest accru[ing] for each particular vehicle based on the amount of time during that month that the vehicle was on the floorplan[.]"[3]  Id.  After a particular vehicle is sold (and ownership

---

[3] Interest accrues under the Comfort IFSA "at a per annum rate designated from time to time by [plaintiffs,]" and is set forth in the Wholesale Billing Statements provided to Comfort.  Comfort IFSA § III.B.1.a, DE #84-3; see Am. Compl. ¶ 13.

papers are delivered to the buyer), however, Comfort is required to remit to plaintiffs the principal balance owed on that particular vehicle within a certain amount of time.  See id. ¶ 20.  Any failure by Comfort to make such remittances (in addition to monthly interest payments) within the prescribed time period constitutes a default under the Comfort IFSA.  See id. ¶ 22; Comfort IFSA § III.H.1, DE #84-3.  In the event of Comfort's default, plaintiffs may assess a default rate of interest and various late fees on Comfort.  See Comfort IFSA §§ III.B.4, III.J.11, DE #84-3; Am. Compl. ¶¶ 23-24.  The Comfort IFSA also requires Comfort to "pay all expenses [of] and reimburse [plaintiffs] for any cost, expense, or other expenditures, including reasonable attorney fees and legal expenses[.]"  Comfort IFSA § III.B.5, DE #84-3.  Finally, the Comfort IFSA grants plaintiffs "a continuing security interest in and collateral assignment of" certain property in which Comfort may have rights.[4]  Am. Compl. ¶ 17; see Comfort IFSA § III.D.1, DE #84-3.

On September 8, 2017, Comfort entered into a second financing agreement with Ally Bank—a Commercial Loan and Security Agreement for a single advance in the amount of $3,300,000 (the "Comfort Commercial Loan").  See Comfort Commercial Loan and Security Agreement (docketed on Feb. 28, 2022) ("Comfort Commercial Loan") §§ I, III.A, DE #84-5; see also Am. Compl. ¶ 21; Comfort Term Loan Report (June 21, 2022) at 2, DE #95-3 (loan history verifying $3,300,000 advance made to Comfort).  Pursuant to the terms of this agreement, interest accrues on Comfort's outstanding loan balance at the prescribed dynamic

---

[4] The Comfort IFSA collateral includes "all [v]ehicles, including but not limited to those for which either of the Ally Parties provides Inventory Financing; other inventory; equipment; fixtures; accounts, including factory open accounts of Dealership; deposit and other accounts with banks and other financial institutions; cash and cash equivalents; general intangibles; all documents; instruments; investment property; and chattel paper."  Comfort IFSA § III.D.1, DE #84-3.

4

interest rate (500 basis points above the 1-M LIBOR Index Rate); moreover, plaintiffs are permitted to assess a 3.00 percent late charge on any overdue payment, as well as a default rate of interest up to the then-current rate of interest, plus 5.00 percent.  See Am. Compl. ¶¶ 22-24; Comfort Commercial Loan §§ III.C.1, III.K.1.a, III.K.1.b, DE #84-5.  The Comfort Commercial Loan further requires Comfort to pay Ally Bank "any and all of [Ally] Bank's costs, fees, and expenses including, without limitation, attorney and other legal fees arising under or related to the [Comfort Commercial] Loan and/or [Comfort Commercial Loan] Collateral."  Comfort Commercial Loan § III.N.2, DE #84-5.  Similar to the Comfort IFSA, the Comfort Commercial Loan grants Ally Bank a continuing security interest in Comfort's property as set forth in the agreement.[5]  See id. § III.F.1; Am. Compl. ¶ 26.  In the event of Comfort's default, plaintiffs may foreclose upon and sell or otherwise dispose of the foregoing collateral.  See Am. Compl. ¶ 27; Comfort Commercial Loan § III.K.1, DE #84-5.

On the same day that it signed the Comfort Commercial Loan, Comfort also entered into a General Security Agreement with Ally Bank (the "Comfort GSA").  See Am. Compl. ¶ 28.  The Comfort GSA grants Ally Bank "a security interest in and collateral assignment of any of the following property owned by Comfort" as of September 8, 2017, id., including "all inventory; equipment; fixtures; accounts, including factory open accounts . . . ; accounts with banks and other financial institutions; cash and cash equivalents; general intangibles; all documents; instruments; investment property; and chattel paper[,]" Comfort General Security Agreement (docketed on Feb. 28, 2022) at 2, DE #84-6.  Plaintiffs perfected their security

---

[5] The Comfort Commercial Loan collateral includes inventory (new and used vehicles, parts, and accessories), accounts, instruments, equipment, general intangibles, chattel paper, cash and cash equivalents, documents, books and records, deposit and other accounts, and fixtures.  See Comfort Commercial Loan § III.F.1, DE #84-5.

interest in this collateral on September 1, 2017, by filing a financing statement with the New York Department of State, in accordance with the New York Uniform Commercial Code.  See Am. Compl. ¶ 29; Comfort UCC Financing Statement (docketed on Feb. 28, 2022) at 2, DE #84-7.

### B.    Route 206's Financing Agreements

Route 206 likewise entered into several financing agreements with plaintiffs, similar to those entered into by Comfort.  First, on November 28, 2017, Route 206 and plaintiffs executed an Inventory Financing and Security Agreement (the "Route 206 IFSA"), pursuant to which plaintiffs agreed "to provide Route 206 with . . . [a] line of credit to acquire new and used vehicles . . . [to] sell[] or leas[e] them to retail customers[,]" Am. Compl. ¶ 38, up to a maximum of $8,820,000, subject to modification, see Route 206 Inventory Financing and Security Agreement (docketed on Feb. 28, 2022) ("Route 206 IFSA") § III.A.2, DE #84-9.

Under the Route 206 IFSA, Route 206 is required to make monthly interest payments, with interest accruing at the rate designated by plaintiffs and set forth in the wholesale billing statements issued by plaintiffs.  See Am. Compl. ¶ 41.  Further, plaintiffs may assess a 5.00 percent late charge on any overdue amount and, in the event of default, a default rate of interest up to the then-current rate of interest, plus 5.00 percent.  See id. ¶¶ 42-43.  Route 206 is responsible for reimbursing plaintiffs for any cost, expense, or other expenditures incurred by plaintiffs, including reasonable attorneys' fees and legal expenses.  See id. ¶ 44; Route 206 IFSA § III.B.5, DE #84-9.  To secure Route 206's debts and obligations to plaintiffs, the Route 206 IFSA grants plaintiffs a security interest in and collateral assignment of certain

property in which Route 206 has or may have an interest.[6]  See Route 206 IFSA § III.D.1, DE #84-9.

On January 8, 2018, Route 206 and Ally Bank next entered into a Commercial Loan and Security Agreement, under which Ally Bank agreed to loan $1,500,000 in a single advance (the "Route 206 Commercial Loan").  See generally Route 206 Commercial Loan and Security Agreement (docketed on Feb. 28, 2022) ("Route 206 Commercial Loan"), DE #84-11; see Am. Compl. ¶¶ 48-49.  Interest accrues on the principal loan balance at 450 basis points above the 1-M LIBOR Index Rate, which fluctuates over time.  See Route 206 Commercial Loan § III.C.1, DE #84-11; Am. Compl. ¶ 50.  The Route 206 Commercial Loan permits Ally Bank to assess a late charge and default rate of interest on Route 206, using the same formulae set forth in the Comfort Commercial Loan.  See supra Section I.A, pp. 4-5; Am. Compl. ¶¶ 51-52.  Likewise, Route 206 is also contractually obligated to pay any costs, fees, and expenses, including attorneys' fees and other legal expenses, incurred by Ally Bank.  See Am. Compl. ¶ 53.  Under this agreement, Ally Bank maintains a security interest in certain Route 206 property,[7] of which plaintiffs may take immediate possession and foreclose upon in the event of a default.  See id. ¶¶ 54-55; Route 206 Commercial Loan § III.F, DE #84-11.

---

[6] The Route 206 IFSA collateral includes "all [v]ehicles, including but not limited to those for which either of the Ally Parties provides Inventory Financing; other inventory; equipment; fixtures; accounts, including factory open accounts of Dealership; deposit and other accounts with banks and other financial institutions; cash and cash equivalents; general intangibles; all documents; instruments; investment property; and chattel paper." Route 206 IFSA § III.D.1, DE #84-9.

[7] The Route 206 Commercial Loan collateral includes inventory (new and used vehicles, and parts and accessories); accounts; instruments; equipment; general intangibles; chattel paper; cash and cash equivalents; documents; books and records; deposit and other accounts with banks/other financial institutions; and fixtures. See Route 206 Commercial Loan § III.F.1, DE #84-11.

On December 28, 2017, Route 206 executed a General Security Agreement, which granted Ally Bank "a continuing security interest in and collateral assignment of certain of Route 206's property[,]" Am. Compl. ¶ 56, in order to "secur[e] the payment and performance of any and all obligations, loans, credit extensions, indebtedness, liabilities, and duties . . . owing to Ally Bank[,]" Route 206 General Security Agreement (docketed on Feb. 28, 2022) at 2, DE #84-12.  Plaintiffs "duly perfected their security interests in [this collateral] in accordance with the [New Jersey Uniform Commercial Code] by filing a financing statement with the New Jersey Department of Treasury[.]"  Am. Compl. ¶ 57; see Route 206 UCC Financing Statement (docketed on Feb. 28, 2022) at 2-3, DE #84-13.

C.     **Cross Agreements and Guarantees**

Defendants entered into two separate agreements with plaintiffs to cross-collateralize, cross-default, and guarantee each defendant's obligations under all of the executed financing agreements (the "Cross Agreements").  See Am. Compl. ¶¶ 30, 58.  Initially, on September 8, 2017, only plaintiffs, Comfort, and Gottdiener entered into a "Cross Collateral, Cross Default, and Guaranty Agreement" in favor of plaintiffs (the "September 2017 Cross Agreement"). See Am. Compl. ¶ 30; see generally Cross Collateral, Cross Default, and Guaranty Agreement dated Sept. 8, 2017 (docketed on Feb. 28, 2022) ("September 2017 Cross Agreement"), DE #84-8.

On November 21, 2017, plaintiffs, Comfort, Route 206, and Gottdiener entered into a second and supplemental "Cross Collateral, Cross Default, and Guaranty Agreement" in favor of plaintiffs (the "November 2017 Cross Agreement").  See Am. Compl. ¶ 58; see generally Cross Collateral, Cross Default, and Guaranty Agreement dated Nov. 21, 2017 (docketed on

8

Feb. 28, 2022) ("November 2017 Cross Agreement"), DE #84-14.  Under the November 2017

Cross Agreement, defendants agreed that a default by one defendant constitutes a default by all

defendants, and that they guarantee the "performance and payment of all Obligations owing by

any of the [defendants] to any of the Ally Parties [i.e., plaintiffs.]"  November 2017 Cross

Agreement ¶¶ 2-4, DE #84-14.  Defendants' "Obligations" are defined therein as:

> any liability, indebtedness or obligation of every kind and nature, now existing
> or hereafter arising, whether created directly, indirectly or acquired by
> assignment, whether matured or unmatured, and any cost or expense, including
> without limitation reasonable attorneys' fees, incurred in the collection or
> enforcement of any such obligation of [defendants], owed by any [defendant] to
> [plaintiffs], any successor, assign, subsidiary[,] or affiliate of [plaintiffs].

Id. ¶ 1(a).  The effect of these cross agreements is that a default in the payment or

performance of any obligation under any of the financing agreements by any defendant

"constitute[s] a default in all payments and performance of all obligations of all [defendants] to

the Ally Parties[.]"  Id. ¶ D at p. 1; see Am. Compl. ¶¶ 67-72.

In addition, Gottdiener signed two guarantees in November 2017—one in favor of each

plaintiff (the "Gottdiener Guarantees")—pursuant to which he agreed to "unconditionally

guarantee the payment of all indebtedness of" Route 206, "together with all costs, expenses

and attorneys['] fees incurred by [plaintiffs] in connection with any default of" Route 206.

Gottdiener Guaranty with Ally Financial Inc. (docketed on Feb. 28, 2022) ("First Gottdiener

Guaranty") at 2, DE #84-15; Gottdiener Guaranty with Ally Bank (docketed on Feb. 28, 2022)

("Second Gottdiener Guaranty") at 2, DE #84-16.

### D.   Events Leading to Defendants' Default

According to the Amended Complaint, in or after March 2019, plaintiffs first

discovered discrepancies between the cash positions reported on Comfort's and Route 206's

financial statements and their internal ledgers.  See Am. Compl. ¶¶ 74-77.  Due to these

discrepancies, plaintiffs demanded that Gottdiener remedy the dealerships' insufficient cash

balance; plaintiffs also audited the floorplans and vehicles sold at the dealerships.  See id. ¶¶

78-79.  Plaintiffs' audit revealed additional irregularities, including payment delays for certain

vehicles sold by Route 206, see id. ¶¶ 80-81, which caused plaintiffs to further investigate

defendants' finances and, in turn, to discover even more serious issues, see, e.g., id. ¶¶ 81-84

(for example, Route 206 was discovered to have artificially extended payment due dates).  To

make matters worse, beginning in April 2019, multiple payments made by Route 206 and

Comfort as remittances for sold vehicles were returned for insufficient funds.  See Keeler

Decl. ¶¶ 84-86, DE #84-2.

Thereafter, on October 31, 2019, plaintiffs sent a letter to defendants expressing

plaintiffs' concerns over defendants' apparent lack of liquidity.  See id. ¶ 87; see Letter dated

Oct. 31, 2019 (docketed on Feb. 28, 2022) ("10/31/19 Letter") at 3-5, DE #84-18.  Therein

plaintiffs informed Gottdiener that, in order to continue financing his dealerships, he would be

required to provide $1,000,000 in additional credit support, see 10/31/19 Letter at 3, DE #84-

18; Keeler Decl. ¶ 87, DE #84-2, but Gottdiener never provided the requested amount, see

Am. Compl. ¶ 89.

In November 2019, plaintiffs conducted a series of audits on both dealerships, which

revealed significant past-due amounts on dozens of sold vehicles.  See id. ¶¶ 90-93.

Defendants remitted payments for some of these vehicles but did not have sufficient funds to

cover the total outstanding past-due amounts.  See id. ¶¶ 91-92.  Comfort and Route 206 were

therefore in default under the Comfort IFSA and Route 206 IFSA, see Comfort IFSA §

10

III.H.1, DE #84-3; Route 206 IFSA § III.H.1, DE #84-9, and thus, by virtue of the Cross

Agreements, in default under the Comfort Commercial Loan and Route 206 Commercial Loan,

<u>see</u> November 2017 Cross Agreement ¶ D at p. 1, DE #84-14, which allowed plaintiffs to

accelerate all payments due under all of the financing agreements, <u>see</u> Am. Compl. ¶ 110; <u>see,</u>

<u>e.g.</u>, Route 206 IFSA § III.J, DE #84-9.  Because Gottdiener was a party to the Cross

Agreements and signed additional guarantees, he, too, was responsible for these accelerated

payments.  <u>See</u> First Gottdiener Guaranty at 2, DE #84-15; Second Gottdiener Guaranty at 2,

DE #84-16.

### E.     The Disposal of Defendants' Collateral

Defendants were jointly notified of their default status in a November 12, 2019 Default

Notice, in which plaintiffs demanded that all amounts due and owing be paid and explained

that, absent payment in full by November 15, 2019, plaintiffs would require the return of all

vehicles to the dealerships' premises, for plaintiffs' retaking of such collateral.  <u>See generally</u>

Default Notice dated Nov. 12, 2019 (docketed on Feb. 28, 2022) ("11/12/19 Default Notice"),

DE #84-20.  Thereafter, plaintiffs paid for on-site representatives to monitor the collateral at

Comfort's and Route 206's various business locations.  <u>See, e.g.</u>, Am. Compl. ¶¶ 108-109.  In

September 2020, plaintiffs took possession of Comfort's vehicles,[8] and caused 397 of these

repossessed vehicles to be sold at auction by Southern Auto Auction ("Southern"); Comfort

itself sold an additional 39 vehicles.  <u>See</u> Keeler Decl. ¶¶ 119-120, DE #84-2.  The sales

profits (minus Southern's fees and expenses) were applied against Comfort's outstanding

---

[8] Plaintiffs incurred significant expenses in the process of repossessing Comfort's vehicles, including having to
pay $130,000 to the landlord of a storage lot where Comfort's vehicles were being stored, in order to satisfy
Comfort's past-due rent obligations and to gain access to the collateral therein.  <u>See</u> Keeler Decl. ¶¶ 113-114, DE
#84-2; <u>see also</u> <i>infra</i> Section III.A.v.

balance under the Comfort IFSA, which yielded an "aggregate shortfall of $3,198,010.65 from the principal amount allocable to those vehicles" (the "Comfort Sold Short Inventory Principal Balance"). Id. ¶ 121. Comfort owed an additional $472,644.00 for the vehicles sold out of trust by Comfort (the "Comfort SOT Inventory Principal Balance"). See id. ¶ 122.[9] On October 23, 2020, after the Comfort Collateral was disposed of, plaintiffs charged off their loans to Comfort, and interest under the Comfort IFSA and Comfort Commercial Loan ceased to accrue. See id. ¶¶ 123, 133.

With respect to the Route 206 Collateral, Route 206, with plaintiffs' consent, sold the NJ Dealership and its assets (i.e., the vehicles) in August 2020. See id. ¶ 127. The proceeds from the sale were applied to the amounts owed under the Route 206 IFSA, resulting in an aggregate shortfall of $367,249.70 in the principal amount allocable to those vehicles (the "Route 206 Sold Short Inventory Principal Balance"). See id. ¶ 128. There is an additional balance of $1,627,722.75 owed to plaintiffs for vehicles financed pursuant to the Route 206 IFSA and sold out of trust by Route 206 (the "Route 206 SOT Inventory Principal Balance"). See id. ¶ 129. On August 28, 2020, plaintiffs charged off their loans to Route 206, and interest ceased to accrue under the Route 206 IFSA and the Route 206 Commercial Loan. See id. ¶¶ 130, 135.

## II.   Procedural History

On May 8, 2020, plaintiffs filed their Amended Complaint—the operative pleading against defendants—alleging claims for breach of contract, breach of guaranty, and replevin

---

[9] Plaintiffs' submissions do not define the practice of selling vehicles "out of trust." "When a dealer sells a vehicle without prompt payment [to the lender] as agreed under their Floor Plan Financing Agreement, it is known as selling a vehicle 'out of trust.'" In re Nissan Litig., 17-CV-729 (KBF), 2018 WL 2113228, at *2 (S.D.N.Y. May 8, 2018).

related to the parties' financing agreements.  See generally Am. Compl.  Defendants filed their

Second Amended Answer on June 30, 2020, denying plaintiffs' allegations and asserting

counterclaims against plaintiffs for tortious interference with contract.[10]  See generally Second

Amended Answer (June 30, 2020) ("Sec. Am. Answer"), DE #22.

Thereafter, beginning with their failure to respond to plaintiffs' initial discovery

demands, defendants repeatedly and willfully ignored their discovery obligations, as well as

related court orders.  See Letter Motion to Compel Discovery (Jan. 26, 2021) at 1-2, DE #53.

As a result, defendants faced numerous sanctions of increasing severity.[11]  See, e.g.,

Memorandum and Order (July 30, 2021) at 7, 11, DE #72 (imposing $500 sanction and

document preclusion at summary judgment and trial stages).  When these sanctions proved

ineffective, plaintiffs moved to strike defendants' Second Amended Answer and enter a default

against each defendant.  See Letter Motion for Sanctions and Default (July 22, 2021) at 3, DE

#71.  On November 23, 2021, this Court issued a Report and Recommendations that plaintiffs'

motion be granted, see Report and Recommendations re . . . Motion for Sanctions and Default

(Nov. 23, 2021), DE #79, which the District Court adopted in its entirety on January 6, 2022,

see generally 1/6/22 Order, DE #80.

Several weeks later, on January 20, 2022, plaintiffs filed a proposed judgment seeking

$12,194,811.09 in damages against defendants, jointly and severally.  See 1/20/22 Proposed

Judgment ¶ 1, DE #81.  Plaintiffs attached a half-page summary listing the aggregate amounts

---

[10] Defendants' counterclaims have since been dismissed pursuant to the District Court's September 3, 2021
Memorandum and Order.  See generally Memorandum and Order (Sept. 3, 2021), DE #76.

[11] Defendants also failed to respond to their then-counsel's motion to withdraw as attorney in the matter, see
generally Motion to Withdraw as Attorney/Motion to Stay (Apr. 9, 2021), DE #64, which the Court granted on
June 17, 2021, see Electronic Order (June 17, 2021).

of nine different forms of damages, but failed to provide any documentation or other evidence to substantiate their considerable damages request.  See id., Exhibit A (chart listing various amounts allegedly due and owing to plaintiffs).  Citing this lack of supporting evidence, Judge Brodie requested that the undersigned magistrate judge conduct an inquest on damages and attorneys' fees.  See 1/24/22 Referral Order.

On February 7, 2022, this Court instructed plaintiffs to supplement their submissions "with the underlying evidence upon which they rely[,]" and, among other things, to "identify and explain how they arrived at the interest and late charges claimed, including how they calculated those items[,]" and to "substantiate the amounts claimed for 'On-Site Representative Fees' and 'Accrued Repo Fees,' with the relevant invoices and proof of [plaintiffs'] payment." Scheduling Order re [Proposed Judgment] (Feb. 7, 2022) ("2/7/22 Scheduling Order") at 2, DE #82.  The same Scheduling Order directed defendants to show cause why the relief requested by plaintiffs should not be granted, see id., but they nevertheless failed to respond.

On February 28, 2022, plaintiffs submitted 38 documents (comprising nearly 600 pages) in support of their damages request, including a revised proposed judgment, the Declaration of Michael Keeler (Executive Director of Ally Bank), the parties' financial agreements, and incomplete loan history documents.[12]  See DE #84-1 to DE #84-38.  Upon reviewing these submissions, the Court identified "a series of deficiencies" therein and directed plaintiffs to supplement their submissions again, by June 7, 2022, to provide, among

---

[12] Plaintiffs thereafter requested that this Court simply enter, as unopposed, plaintiffs' revised proposed judgment. See Letter Motion for Judgment on the Pleadings (May 5, 2022), DE #88.  The Court denied plaintiffs' request on the grounds that (1) magistrate judges are not empowered to enter judgment in a non-consent case and (2) plaintiffs' damages are not deemed to be established by virtue of defendants' default.  See Order denying . . . Motion for Judgment on the Pleadings (May 6, 2022).

other things, "a detailed explanation of their calculations of the principal balances, accrued interest, and late fees under the commercial loans and IFSAs, [and to furnish] the loan history for each contract[,]" as well as "the titles and professional/educational backgrounds for each timekeeper for which attorneys' fees are sought." Scheduling Order (May 24, 2022) ("5/24/22 Scheduling Order").

Plaintiffs' counsel moved for an extension of time to provide the requested information, see Letter Motion for Extension of Time to File (May 25, 2022) at 1, DE #90, and the Court extended the deadline until June 21, 2022, see Order (May 25, 2022) ("5/25/22 Order").[13]  On June 21, 2022, plaintiffs' counsel filed a supplemental declaration, as well as 16 additional exhibits (spanning more than 1,100 pages) in support of plaintiffs' substantial damages request.[14]  See generally Keeler Supp. Decl., DE #95; DE #95-1 to #95-16.  Defendants filed no response to plaintiffs' submissions on damages.

## DISCUSSION

## I.  Legal Standard

For the purposes of determining liability in the default context, a court accepts all well-pleaded allegations in the complaint as true.  See Greyhound Exhibitgroup, Inc., 973 F.2d at 158.  A party's default is not, however, an admission of damages.  See id.  Rather, the plaintiff bears the burden of proving its damages with evidentiary submissions.  See id.  The moving party is entitled to all reasonable inferences from the evidence it offers.  See Finkel v.

---

[13] The Court also gave plaintiffs' counsel the alternative option to file "a motion to withdraw the request for entry of judgment, without prejudice to filing (and serving) a renewed motion by July 22, 2022."  5/25/22 Order. Counsel elected to supplement plaintiffs' submissions by the June 21, 2022 deadline.

[14] Mr. Keeler avers that these 16 attachments to his declaration "are either maintained in the ordinary course [of business] or are based on such information."  Keeler Supp. Decl. ¶ 4, DE #95.

Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

A court may hold an inquest hearing on damages but need not do so where the plaintiff has submitted documentary evidence in support of its claim.  See Romanowicz, 577 F.3d at 83 n.6 (hearing deemed unnecessary where the plaintiff did not request one and submitted documentary evidence of damages).  While not required to hold an inquest hearing, a court should not simply accept a plaintiff's statement of damages at face value.  See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (district court's acceptance of statement of damages at face value "did not satisfy the court's obligation to ensure that the damages were appropriate").  "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award any damages even though liability has been established through default."  Garpo Marine Servs. Inc. v. Island Romance, 19-CV-6875-EK-SJB, 2021 WL 6805890, at *8 (E.D.N.Y. Sept. 30, 2021) (citation omitted), adopted, 2022 WL 341194 (E.D.N.Y. Feb. 4, 2022).

Here, plaintiffs ask that the Court award them $11,551,415.42 in damages and $550,068.79 in attorneys' fees and costs.  See Keeler Supp. Decl. ¶ 44, DE #95.  In support of their request, plaintiffs have provided a total of 54 exhibits, including the financial agreements at issue, loan history records, and billing statements.  The Court therefore exercises its discretion and declines to conduct an inquest hearing and evaluates plaintiffs' entitlement to damages on the record before it.

## II.    <u>Choice-of-Law Analysis</u>

As a preliminary matter, the Court must consider what state law governs the

determination of damages and attorneys' fees in this diversity action.  <u>See</u> <u>D'Amato v. Five</u>

<u>Star Reporting, Inc.</u>, 80 F.Supp.3d 395, 407 (E.D.N.Y. 2015).  The Second Circuit has held

that "[a] federal court sitting in diversity applies the choice-of-law rules of the forum state[,]"

which, here, is New York.  <u>Maryland Cas. Co. v. Cont'l Cas. Co.</u>, 332 F.3d 145, 151 (2d

Cir. 2003) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).  "In a

contract dispute, New York courts will generally honor a choice-of-law provision in an

agreement."  <u>Scharnikow v. Siracuse</u>, 15-CV-6991 (DRH) (SIL), 2016 WL 7480360, at *3

(E.D.N.Y. Dec. 6, 2016) (citation omitted), <u>adopted</u>, 2016 WL 7480364 (E.D.N.Y. Dec. 29,

2016).  "As other courts have observed, however, this principle occasionally contradicts the

general rule that where neither party raises the issue of choice-of-law and all parties cite

exclusively to New York law, such implied consent … is sufficient to establish choice of law

in the Second Circuit."  <u>Leser v. U.S. Bank Nat'l Ass'n</u>, No. 09–CV–2362 (KAM)(MDG),

2012 WL 4472025, at *5 (E.D.N.Y. Sept. 25, 2012) (internal quotation marks and citation

omitted); <u>accord</u> <u>Culwick v. Wood</u>, 15 CV 5868 (ENV) (CLP), 2021 WL 7906500, at *13

(E.D.N.Y. Sept. 9, 2021) (finding that the parties "ha[d] implicitly consented to have the issue

of attorney's fees decided according to New Jersey law" where neither side addressed choice

of law but "couched their arguments for and against attorney's fees by citation to New Jersey

law" (collecting cases)); <u>see</u> <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir.

2000) (where "[t]he parties' briefs assume that New York law controls," Second Circuit finds

parties' implied consent, sufficient to establish choice of law (citation omitted)).

17

Here, the parties' financing agreements contain different choice-of-law provisions—some dictate that New York law governs, while others opt for New Jersey law. See, e.g., Comfort IFSA § III.I.2, DE #84-3 ("This Agreement must be construed, interpreted, and enforced in accordance with the laws of the state of NY without regard to its conflict of laws rules."); Route 206 IFSA § III.I.2, DE #84-9 (incorporating New Jersey choice-of-law provision). In court filings, however, the parties cited exclusively to New York law (or to federal opinions applying New York law).[15] See, e.g., Sec. Am. Answer ¶¶ 16, 24, 29, 30, 35, DE #22 (citing New York law in asserting affirmative defenses, including in connection with plaintiffs' claims arising out of contracts with New Jersey choice-of-law provisions); Memorandum in Support of Plaintiffs' Motion to Dismiss the Second Amended Counterclaims (Sept. 11, 2020) at 14-19, DE #37-1 (citing New York law). Moreover, plaintiffs do not address choice of law in their papers, nor do defendants, by virtue of their default. "Under these circumstances, courts in this circuit have applied the law of a state other than the one specified in a contract's choice-of-law provision where the parties have failed to address the issue and also cited exclusively to the alternative state's laws." Leser, 2012 WL 4472025, at *5 (collecting cases) (concluding that New York law applied, "despite the [contracts'] Virginia choice-of-law provisions"); accord Pogodin v. Cryptorion Inc., 18-CV-791 (ENV) (SMG), 2020 U.S. Dist. LEXIS 173999, at *15 n.4 (E.D.N.Y. Sept. 17, 2020) (where parties had cited to New York law, court applies New York law in considering motion for default judgment, despite California choice-of-law provision in promissory note), adopted, Order

---

[15] Plaintiffs have not filed a memorandum of law in connection with their request for damages; instead, they have provided several damages-related affidavits, none of which contains citations to any caselaw. See generally Keeler Decl., DE #84-2; Keeler Supp. Decl., DE #95.

(E.D.N.Y. Oct. 13, 2020); see Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 294 (2d Cir. 1986) (Friendly, J.) (court was not obligated to investigate potential differences between New York and California law where the parties cited only to the former).  Accordingly, the Court applies New York law in rendering its recommendations regarding plaintiffs' motion. See, e.g., Jin Young Chung v. Yoko Sano, No. 10 CV 2301(DLI), 2011 WL 1303292, at *7 (E.D.N.Y. Feb. 25, 2011) (although "it appear[ed] that New Jersey law may apply," court looked to the law of the forum state, New York, where plaintiff "ha[d] not taken any position" on choice of law and defendant had defaulted), adopted sub nom. Jin Yung Chung v. Sano, 2011 WL 1298891 (E.D.N.Y. Mar. 31, 2011).

## III.   Damages

"Under New York law, it is well-settled that '[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.'"[16]  LG Capital Funding, LLC v. Wowio, Inc., 16-CV-6632 (AMD),

---

[16] As discussed *supra*, by virtue of the November 2017 Cross Agreement and Gottdiener Guarantees, all defendants are liable for the obligations of all defendants under the financing agreements.  While this matter has been specifically referred for an inquest on damages, the Court briefly addresses whether plaintiffs have sufficiently pled the claims necessary to recover the requested damages from all defendants: breach of contract and breach of guaranty.

Here, the District Court entered a default against defendants as a discovery sanction.  The principle that "a party's default is . . . deemed an admission of the plaintiff[s'] well-pleaded allegations of fact pertaining to liability . . . applies regardless of whether default is entered as a discovery sanction or for failure to defend." Montblanc-Simplo GmbH v. Colibri Corp., 692 F.Supp.2d 245, 253 (E.D.N.Y. 2010) (internal citations omitted).  To state a cause of action for breach of contract under New York law, plaintiffs must (and do in fact) allege: "(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach."  Beautiful Jewellers Private Ltd. v. Tiffany & Co., 438 F.App'x 20, 21-22 (2d Cir. 2011) (citation omitted).  By way of example, the Amended Complaint alleges that Route 206 and the Ally Parties entered into the Route 206 IFSA, pursuant to which plaintiffs provided the dealership with floorplan financing and otherwise performed their contractual obligations.  See Am. Compl. ¶¶ 38, 174-175.  Further, the Amended Complaint alleges that Route 206 breached this contract by failing to remit principal payments for sold vehicles (financed by plaintiffs) within the prescribed time, which constituted a default.  See id. ¶¶ 176-179.  As a result, plaintiffs allege that they incurred damages in the form of unpaid due loan amounts and related costs.  See id. ¶ 184.  Thus, plaintiffs have sufficiently stated a claim for breach of contract.  The Amended Complaint contains multiple claims for breach of various other contracts, all of which contain similar allegations.  See id., Counts I-II, IV.                              [Footnote continued on p. 20]

2018 WL 3202077, at *10 (E.D.N.Y. Apr. 24, 2018) (quoting Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir. 2007)), adopted, 2018 WL 2224991 (E.D.N.Y. May 15, 2018).  Here, plaintiffs assert that they are contractually entitled to $11,551,415.42 in damages, which is comprised of defendants' purported obligations under both the IFSAs ($8,113,564.13) and commercial loans ($3,437,851.29).  See Keeler Supp. Decl. ¶ 44, DE #95.  Having considered plaintiffs' submissions, and for the reasons set forth below, this Court respectfully recommends that the District Court award plaintiffs $11,326,059.37 in total damages under the parties' financing agreements.

### A.   Damages Owed Under the IFSAs

Plaintiffs claim that defendants' total financial obligation under the Comfort IFSA and the Route 206 IFSA is $8,113,564.13, inclusive of defendants' unpaid principal balances, accrued interest, and various types of fees.  See Keeler Supp. Decl. ¶ 28, DE #95.  As discussed in greater detail below, this Court respectfully recommends that plaintiffs be awarded $8,111,773.46 in damages under the Comfort IFSA and the Route 206 IFSA.

---

With respect to breach of guaranty, under New York law, plaintiffs must (and do in fact) allege "(1) an underlying obligation, (2) a guarant[y], and (3) failure by the guarantor to make payment in accordance with the terms of the guarant[y]."  Bank of Am., N.A. v. Vanderbilt Trading USA LLC, No. 17-CV-7167 (RER), 2019 WL 8807747, at *8 (E.D.N.Y. Sept. 9, 2019) (citation omitted) (alterations added by court in Vanderbilt Trading).  "A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person [or entity] liable to pay or perform the obligation fails."  Id. (citation omitted).  For example, plaintiffs allege that (1) Gottdiener had an obligation to plaintiffs under the Gottdiener Guarantees, (2) Gottdiener signed these guarantees, requiring him to unconditionally pay all indebtedness of Route 206 in connection with any default by the dealership, and (3) Route 206 defaulted but Gottdiener did not remit the requisite principal payments under the Route 206 IFSA.  See Am. Compl. ¶¶ 215-224.  Plaintiffs have therefore adequately alleged breach of guaranty and, thus, the Court properly assesses the damages incurred in connection with the financing agreements.  The Amended Complaint likewise contains two additional claims for breach of guaranty against Comfort and Gottdiener, both of which set forth allegations comparable to those set forth in the claim against Route 206.  See id., Counts V-VI.

###### i.      *Unpaid Principal Balances*

Plaintiffs seek two categories of unpaid principal balances under each IFSA: (1) the SOT inventory principal balance and (2) the "sold short" inventory principal balance.  See *id.* The SOT or "sold out of trust" inventory principal balances refer to the amounts owed by defendants for those vehicles sold by Comfort and/or Route 206, but for which the dealerships did not remit the requisite principal payments.  See *In re* Nissan Litig., 2018 WL 2113228, at *2.  The "sold short" inventory principal balances, on the other hand, reflect the amounts still owed for the vehicles sold at auction and/or by the dealerships after the proceeds from these sales were applied to the principal balance for defendants' vehicles.  See Keeler Decl. ¶¶ 121, 128, DE #84-2.  Regarding these two subcategories of damages, plaintiffs assert that defendants owe an aggregate total of $5,665,627.10.  See Keeler Supp. Decl. ¶ 28, DE #95.

*SOT Inventory Principal Balances:* With respect to the SOT inventory principal balances, plaintiffs claim that Route 206 and Comfort owe $1,627,722.75 and $472,644, respectively.  See id.; Keeler Decl. ¶¶ 122, 129, DE #84-2.  To substantiate this claim, plaintiffs have provided accounting records listing the vehicles that were financed by plaintiffs and sold by Route 206 and Comfort, but for which the dealerships failed to remit principal-balance payments.  See generally Accounting of Route 206 SOT Inventory Principal Balance (Feb. 28, 2022) ("Route 206 SOT Accounting"), DE #84-33; Accounting of Comfort SOT Inventory Principal Balance (Feb. 28, 2022) ("Comfort SOT Accounting"), DE #84-28. These accounting records include the vehicle identification number ("VIN"), specifications (year/make/model), and outstanding principal balance for each vehicle that defendants sold out of trust.  See generally id. Route 206 SOT Accounting, DE #84-33; Comfort SOT Accounting,

DE #84-28.  The sum totals of the principal balance amounts for these vehicles, as reflected in the accounting records, are identical to those requested by plaintiffs.  <u>Compare</u> Route 206 SOT Accounting at 3, DE #84-33 (listing 57 vehicles with balances totaling $1,627,722.75) and Comfort SOT Accounting at 2, DE #84-28 (listing 9 vehicles with balances totaling $472,644), <u>with</u> Keeler Supp. Decl. ¶ 28, DE #95 (requesting the same).  Thus, plaintiffs have demonstrated to a reasonable certainty the SOT inventory principal balance amounts owed by defendants, which total $2,100,366.75.

     ***Sold Short Inventory Principal Balances:*** Plaintiffs assert that Route 206 and Comfort owe $367,249.70 and $3,198,010.65 in "sold short" inventory principal balances, respectively.  <u>See</u> Keeler Supp. Decl. ¶ 28, DE #95.

     Having reviewed plaintiffs' business records and other evidence, the Court finds that plaintiffs have substantiated Route 206's "sold short" principal balance.  Specifically, the Court is in possession of the accounting records for the new and used vehicles sold by Route 206 with plaintiffs' permission in order to pay down Route 206's obligations under the IFSA; these records also list the "shortfall" or difference between the amount owed and the sale proceeds for each financed vehicle.  <u>See</u> Accounting of Route 206 Sold Short Inventory Principal Balance (Feb. 28, 2022) ("Route 206 Sold Short Accounting") at 2-6, DE #84-32.  The Court has verified that shortfalls for these vehicles add up to the total damages requested by plaintiffs.  <u>Compare</u> <u>id.</u> at 5, 6 (reflecting shortfall totals of $257,032.70 and $110,217.00 for new and used vehicles, respectively), <u>with</u> Keeler Supp. Decl. ¶ 28, DE #95 (requesting $367,249.70 in damages, representing the Route 206 IFSA "sold short" inventory principal balance).  In addition, the Court has examined the Route 206 Lien Release Agreement, in

which the parties set forth a list of the vehicles that plaintiffs permitted Route 206 to sell in

order to pay down its debt under the Route 206 IFSA.  See Route 206 Lien Release Agreement

(docketed on Feb. 28, 2022) at 8-12, DE #84-31.  The VINs and specifications

(year/make/model) for these vehicles correspond to those included in plaintiffs' accounting

records.  Compare, e.g., id. at 8 (listing 2019 Kia Forte with VIN 3KPF24AD2KE045092),

with Route 206 Sold Short Accounting at 2, DE #84-32 (listing the same).  Thus, it is this

Court's recommendation that plaintiffs be awarded $367,249.70 in connection with the Route

206 inventory "sold short" principal balance.

Likewise, plaintiffs have substantiated their entitlement to the Comfort "sold short"

inventory principal balance of $3,198,010.65.  Plaintiffs have provided an accounting of the

Comfort collateral sold by Southern at auction and by Comfort itself with plaintiffs'

permission.  See generally Accounting of Comfort Sale Proceeds (Feb. 28, 2022), DE #84-27.

The total shortfall reflected therein is $3,439,103.97 (i.e., $2,960,867.97 for vehicles sold by

Southern at auction + $478,236.00 for vehicles sold by Comfort).  See id. at 9-10.[17]  The total

shortfall amount reflected in the aforementioned accounting records exceeds plaintiffs'

damages request of $3,198,010.65 in "sold short" inventory principal balance under the

Comfort IFSA.  See Keeler Supp. Decl. ¶ 28 (Chart), DE #95.  The sworn declaration

proffered by plaintiffs accounts for this discrepancy (which benefits defendants), explaining

"that the amount shown on the chart [in DE #95] reflects the fact that the Ally Parties

---

[17] The Court has compared and confirmed several vehicles' shortfall amounts listed in the accounting records with Southern's itemized final auction report (the "Southern Auction Report").  For example, plaintiffs' Comfort-related accounting records contain an entry for a 2020 Jeep Gladiator (VIN 1C6HJTAG3LL 108345) with a $43,932.00 outstanding balance, $40,253.68 in sale proceeds, and a $3,678.32 shortfall.  See Accounting of Comfort Sale Proceeds at 2, DE #84-27.  In the Southern Auction Report, there is a matching entry for the same Jeep Gladiator with an "Application" amount of $40,253.68 and an outstanding balance of $43,932.00, the difference of which is $3,678.32.  See Southern Final Auction Report (Feb. 28, 2022) at 11, DE #84-25.

recovered $241,093.32 from an FCA / Chrysler . . . open account[,] which was among the various collateral under the Comfort IFSA[,]" and plaintiffs applied this credit to the outstanding balance.  Id. ¶ 28 (Chart) n.28.  Thus, plaintiffs have met their burden of substantiating their damages under the Comfort IFSA related to the "sold short" inventory principal balance.  See, e.g., E. Sav. Bank, FSB v. Whyte, No. 13–CV–6111 (CBA)(LB), 2015 WL 790036, at *6-7 (E.D.N.Y. Feb. 24, 2015) (adopting magistrate's Report and Recommendation, which found that the proffered affidavits asserting the outstanding principal and accompanying payment log were sufficient to establish the principal balance owed by defendant).  Indeed, plaintiffs more than met their burden by providing additional information relating to other recovered collateral, and have credited defendants with these additional sums, thereby reducing the damages that plaintiffs seek.  See id.  Given defendants' default status, and their failure to respond to plaintiffs' motion for default judgment, defendants are in no position to complain that they are entitled to more than the extra $241,093.32 recovery credit proposed by plaintiffs.  The Court is therefore satisfied that plaintiffs have substantiated their request for the Comfort "sold short" principal balance of $3,198,010.65.

Consequently, the Court recommends that plaintiffs be awarded $5,665,627.10 in outstanding principal balances under the IFSAs.

### ii.    Unpaid Accrued Interest

Plaintiffs request $1,341,580.05 in unpaid accrued interest under the Comfort IFSA. See Keeler Supp. Decl. ¶ 28, DE #95.  Comfort's initial floorplan advance was funded in September 2017 and, after the NY Dealership was liquidated, interest ceased to accrue under the IFSA in October 2020.  See Keeler Decl. ¶¶ 9, 123, DE #84-2.  Following Comfort's

default on its IFSA loan in November 2019, the Ally parties imposed a default interest rate, effective December 1, 2019, as permitted under the terms of the contract.  See id. ¶ 104; 11/12/19 Default Notice at 3-4, DE #84-20.  Per the Comfort IFSA, plaintiffs were permitted to set the interest rate, including a default interest rate (up to a certain amount), which was to be identified in the wholesale billing statements.  See Comfort IFSA § III.B.1, DE #84-3 ("The rate(s) of Interest set forth in the Wholesale Billing Statement *will constitute the current effective Interest rate(s)* between Dealership and [] each of the Ally Parties and will continue in force unless Dealership is notified to the contrary." (emphasis added)); id. § III.J.11 (providing that "each of the Ally Parties may immediately assess a default rate of Interest up to the current rate of Interest plus five percent").

To support their calculation of the unpaid accrued interest under the Comfort IFSA, plaintiffs have proffered a transaction report reflecting the consolidated history of the Comfort floorplan financing, including monthly interest accrued for December 2019 through October 2020, see generally Comfort Floorplan Transaction Report (June 21, 2022) ("Comfort FP Report"), DE #95-6, as well as the wholesale billing statements issued to Comfort, which set forth the applicable interest rate(s), see generally Comfort Wholesale Billing Statements (docketed on Feb. 28, 2022) ("Original Comfort WBS"), DE #84-4; Comfort Wholesale Billing Statements – Part I (docketed on June 21, 2022) ("Comfort WSB Part I"), #95-11; Comfort Wholesale Billing Statements – Part II (docketed on June 21, 2022), DE #95-12.  The amounts of unpaid interest listed in the Comfort Floorplan Transaction Report yield a total of $1,341,580.05, see Comfort FP Report at 4, DE #95-6, which is the same amount requested in the Supplemental Keeler Declaration, see Keeler Supp. Decl. ¶ 28, DE #95.  Moreover, the

interest amounts listed in the Comfort Floorplan Transaction Report for each month after the liquidation of the NY Dealership can be confirmed by the corresponding wholesale billing statement.[18]  Notably, plaintiffs have also provided the Court with a reference guide for interpreting the wholesale billing statements, see generally Wholesale Billing Statement Guide (June 21, 2022) ("WBS Guide"), DE #95-13, in which plaintiffs include an example of their interest calculations, see id. ¶ 7.  While plaintiffs do not tender their step-by-step methodology, the Court was able to recreate the interest calculation in the example, thereby confirming its accuracy.[19]  In light of this supporting evidence, the Court concludes that plaintiffs properly calculated the interest owed under the Comfort IFSA.

With respect to the Route 206 IFSA, plaintiffs seek $469,608.622 in interest thereunder.  See Keeler Supp. Decl. ¶ 28, DE #95.  Much like the Comfort IFSA, plaintiffs were contractually permitted to assess interest rates and default interest rates at their discretion (subject to limitations) under the Route 206 IFSA; the interest rate included in a given month's wholesale billing statement constitutes the given interest rate.  See Route 206 IFSA §§ III.B.1, III.J.11, DE #84-9.  The accrued interest for each month following Route 206's default until

---

[18] For example, the Comfort Floorplan Transaction Report reflects the unpaid interest for October 2020 as $17,995.96, and the corresponding wholesale billing statement for the same billing period shows a total of $17,995.96 in interest under the "GRAND TOTAL FOR STATEMENT" row and the "INTEREST" column. Compare Comfort FP Report at 4, DE #95-6, with Comfort WSB Part I at 5, DE #95-11.

[19] In the Comfort IFSA example, plaintiffs state that the interest amount of "$210.94 [was calculated] based on an outstanding balance of $25,786.00 billed at 9.50% for 31 days."  WBS Guide ¶ 7, DE #95-13.  The per annum interest rate for this period is 9.5 percent.  However, the contract specifies that the per annum interest rate is calculated on a 365/360 basis.  See Comfort IFSA § III.B.1.a, DE #84-3.  Banking institutions commonly use this "365/360" basis to standardize the daily interest rates based on a 30-day month.  Therefore, to calculate the per annum interest rate based on these contractual specifications, the interest rate of .095 is multiplied by (365 ÷ 360), which equals .096319 or 9.6319 percent.  The billing period percentage is then calculated by dividing the number of days in that billing period by 365 (31 days ÷ 365 = .084931 or 8.4931 percent).  The adjusted monthly interest rate of 9.6319 percent is then multiplied by the outstanding balance for that billing period, the total of which is multiplied by the billing period percentage of 8.4931 percent, yielding $210.94 (i.e., $25,786.00 loan balance x .096319 daily interest rate x .084931 billing period percentage = $210.94 total interest).

26

the loan was charged off—December 2019 until August 2020—is set forth in the Route 206

Floorplan Transaction Report, see Route 206 Floorplan Transaction Report (June 21, 2022)

("Route 206 FP Report") at 3, DE #95-5, as well as in the wholesale billing statements

provided by plaintiffs, see generally Route 206 Wholesale Billing Statements for Dec. 2019

through Oct. 2020 (docketed on Feb. 28, 2022) ("Original Route 206 WBS"), DE #84-10;

Route 206 Wholesale Billing Statements – Part I (docketed on June 21, 2022), DE #95-7;

Route 206 Wholesale Billing Statements – Part II (docketed on June 21, 2022), DE #95-8;

Route 206 Wholesale Billing Statements – Part III (docketed on June 21, 2022), DE #95-9;

Route 206 Wholesale Billing Statements – Part IV (docketed on June 21, 2022), DE #95-10.

The Route 206 Floorplan Transaction Report reflects an accrued monthly interest subtotal of

$507,738,71.  See Route 206 FP Report at 3, DE #95-5.  The aforementioned report further

reflects that a credit of $38,130.09 was applied to this subtotal, which plaintiffs aver represents

sale-and-recovery proceeds applied by the Ally Parties to the remaining floorplan balance,

thereby yielding the decreased total of $469,608.62 in unpaid accrued interest sought by

plaintiffs.  See id.; Keeler Supp. Decl. ¶ 28, DE #95.  The outstanding monthly interest

amounts enumerated in the same report can be confirmed by the Route 206 wholesale billing

statements.  Compare, e.g., Route 206 FP Report at 3, DE #95-5 (recording $27,806.39 in

interest due for August 2020 billing period), with Original Route 206 WBS at 28, DE #84-10

(listing $27,806.39 in interest due under "GRAND TOTAL FOR STATEMENT" in the

"INTEREST" column).  Based on the aforementioned evidence, and for the same reasons

stated in connection with the Comfort IFSA interest calculation, the Court finds that plaintiffs

have sufficiently proven the interest amount requested under the Route 206 IFSA.  See, e.g., Whyte, 2015 WL 790036, at *6-7.

As such, plaintiffs should be awarded a combined total of $1,811,188.67 in unpaid accrued interest under both IFSAs.

### iii.    Unpaid Late Fees

Plaintiffs request $40,709.17 in unpaid late fees in connection with the Comfort IFSA.  See Keeler Supp. Decl. ¶ 28, DE #95.  To support this damages request, plaintiffs again rely upon the Comfort Floorplan Transaction Report, which sets forth the late fees incurred from December 2019 through October 2020, totaling $40,709.17.  See Comfort FP Report at 4, DE #95-6.  Similar to the Comfort IFSA unpaid interest amounts, the late fee amounts listed in the Comfort Floorplan Transaction Report correspond to those set forth in Comfort's wholesale billing statements.[20]  For example, the late fee total for August 2020 is listed as $5,843.27, see id., and the wholesale billing statement for August 2020 shows late fees in the amounts of $5,270.26, $411.63, and $161.38, which total $5,843.27, see Original Comfort WBS at 27-28, DE #84-4.

In connection with the Route 206 IFSA, plaintiffs ask that the Court award $13,248.52 in unpaid late fees.  See Keeler Supp. Decl. ¶ 28, DE #95.  In addition to the interest amounts, the Route 206 Floorplan Transaction Report provides a breakdown of the monthly late fees assessed on Route 206, the aggregate total of which is $13,248.52.  See Route 206 FP Report

---

[20] This transaction report contains what appears to be a scrivener's error, as the preparer of this transaction report erroneously entered four of the late fee entries one row higher than they should have been, resulting in a misalignment of the billing periods and the late fee totals in the spreadsheet.  See, e.g., Comfort FP Report at 4, DE #95-6 ($7,270.94 in late fees erroneously listed for April 2020 instead of the correct billing period of March 2020, which is confirmed by the corresponding wholesale billing statements).

at 3, DE #95-5.  These late fee amounts can be traced to and verified by the corresponding Route 206 wholesale billing statements.[21]  Compare, e.g., id. (August 2020 unpaid late fees recorded as $2,484.18), with Route 206 Original WBS at 27-28, DE #84-10 (August 2020 Route 206 wholesale billing statement showing unpaid late fees in the amounts of $1,815.77, $112.66, and $555.75).

Accordingly, the Court recommends that plaintiffs be awarded unpaid late fees in the following amounts: $40,709.17 under the Comfort IFSA and $13,248.52 under the Route 206 IFSA.

### iv.    On-Site Representative Fees

According to their submissions, plaintiffs are owed $451,000 in fees for "on-site representatives," whom plaintiffs employed to monitor the inventory at the two dealerships after they discovered indicia of defendants' fraud and mismanagement and various discrepancies in defendants' financial statements.  See Keeler Supp. Decl. ¶ 28, DE #95; Am. Compl. ¶¶ 74-98, 108-109.  Plaintiffs have submitted to the Court the invoices for the on-site representative fees, which reflect a total of $183,750 for Route 206 and $317,250 for Comfort. See generally Comfort On-Site Representative Invoices (Feb. 28, 2022), DE #84-29; Route 206 On-Site Representative Invoices (Feb. 28, 2022), DE #84-34.  The outstanding on-site representative fee amounts reflected in the invoices exceed by $50,000 ($25,000 per dealership) the combined totals for the two dealerships set forth in the Supplemental Keeler Declaration and sought by plaintiffs in the pending motion.  See Keeler Supp. Decl. ¶ 28, DE

---

[21] The Route 206 Floorplan Transaction Report reveals the same type of scrivener's error discussed *supra* note 20. Nevertheless, the aggregate total of the late fees incurred related to Route 206 is accurate, as confirmed by the wholesale billing statements.

#95 (requesting $158,750.00 and $292,250.00 in on-site representative fees for Route 206 and Comfort, respectively).  This discrepancy between the invoices and the requested damages is attributable to the fact that "the Ally Parties recovered $25,000.00, which was applied to the accrued On-Site Representative fees [for each dealership]."  Keeler Supp. Decl. ¶ 28 (Chart) nn.33-34, DE #95.  The Court therefore recommends awarding plaintiffs $451,000 in on-site representative fees, as requested.

### v.    Other Fees

Lastly, plaintiffs assert that defendants are contractually obligated to reimburse plaintiffs for $131,790.67 for other fees that were incurred in the process of repossessing Comfort's collateral (i.e., the financed vehicles) from a storage lot located in Staten Island. See id. ¶ 28 n.35.  More specifically, plaintiffs incurred these costs to gain access to these vehicles, which were otherwise inaccessible due to Comfort's "delinquen[cy] in the payment of rent on an auxiliary vehicle storage lot located in Staten Island[,] New York[.]"  Am. Compl. ¶¶ 130-132.  The requested fees include the $130,000 paid to the landlord of the storage lot in exchange for the release of the Comfort collateral, as well as $1,790.67 in related "repairs and expenses[.]"  See Keeler Supp. Decl. ¶ 28 (Chart) n.35, DE #95.[22]

As part of their supplemental submissions, plaintiffs have provided a copy of the contract between plaintiffs and the storage lot landlord, wherein plaintiffs agreed to pay said landlord $130,000 in exchange for the ability to retrieve the vehicles stored at the facility (as well as the landlord's promise not to sue).  See generally Confidential Release and Covenant

---

[22] Plaintiffs aver that these repossession fees are distinct from those in the wholesale billing statements, which reflect "'repo' fees charged in connection with the vehicle auction."  Keeler Supp. Decl. ¶ 28 (Chart) n.35, DE #95.

Not to Sue (docketed on Feb. 28, 2022), DE #84-23; see also Am. Compl. ¶¶ 130-132.  In

contrast, plaintiffs have provided no documentation regarding the "repairs and expenses for the

vehicles" totaling $1,790.67, nor have they provided a breakdown of this amount.  See Keeler

Supp. Decl. ¶ 28 (Chart) n.35, DE #95 (failing to cite any portion of the record to support the

additional $1,790.67).  Thus, plaintiffs should be awarded only $130,000 in "other fees."

### B.      Damages Owed Under the Commercial Loans

Plaintiffs seek a total sum of $3,437,851.29 in outstanding principal, interest, and late

fees under the Comfort Commercial Loan and the Route 206 Commercial Loan.  See Keeler

Supp. Decl. ¶ 12 (Chart at pp. 4-5), DE #95.  For the following reasons, the Court concludes

that plaintiffs have established their entitlement to $3,214,285.91 in total damages in

connection with the commercial loans.

### i.      Unpaid Principal Balances

With respect to the unpaid principal balances, defendants purportedly owe

$2,160,714.41 under the Comfort Commercial Loan and $1,053,571.50 under the Route 206

Commercial Loan.  See id. ¶ 12 (Chart at p. 4), DE #95.  As an initial matter, plaintiffs have

proffered the transaction history for each commercial loan, which substantiates plaintiffs'

allegations that Ally Bank extended advances to Comfort and Route 206 in the amounts of

$3,300,000 and $1,500,000, respectively.  See Am. Compl. ¶¶ 21, 49; Comfort Term Loan

Transaction Report (June 21, 2022) ("Comfort Term Loan Report") at 2, DE #95-3 (report

showing $3,300,000 "LOAN ADDED" to Comfort's account on September 18, 2017); Route

206 Term Loan Transaction Report (June 21, 2022) ("Route 206 Term Loan Report") at 2,

DE #95-1 (report showing $1,500,000 "LOAN ADV" for Route 206's account on January 12,

2018).  As previously noted, plaintiffs are entitled to be placed in the position they would have occupied had defendants not defaulted, which, in this case, involves being fully repaid for the total amount of these loan advances.  <u>See</u> Comfort Commercial Loan § III.D, DE #84-5 (Comfort was obligated to make "83 successive monthly installments" of $39,285.71 on the principal balance "and one final payment of all [commercial loan] amounts remaining unpaid"); Route 206 Commercial Loan § III.D, DE #84-11 (Route 206 was required to repay the total principal balance in "83 monthly installments of" $17,857.14, followed by one final payment of the remaining loan balance).

Plaintiffs assert that Comfort made a total of $982,142.75 in monthly payments and that Route 206 made a total of $392,857.08 in monthly payments on each dealership's respective principal loan balance, yielding an aggregate of $1,374,999.83 in payments.  <u>See</u> Keeler Supp. Decl. ¶ 12 (Chart at p. 4), DE #95.  Again, the transaction history for each commercial loan reflects that defendants did, in fact, remit payments totaling these amounts.  <u>See</u> Comfort Term Loan Report at 2, DE #95-3 (showing 25 payments of $39,285.71 each); Route 206 Term Loan Report at 2, DE #95-1 (showing 22 payments of $17,857.14 each).  In addition to defendants' direct payments, plaintiffs deducted from the total principal loan balance $210,714.26 in funds recovered by plaintiffs from other collateral—specifically, $157,142.84 in connection with the Comfort Commercial Loan and $53,571.42 in connection with the Route 206 Commercial Loan.  <u>See</u> Keeler Supp. Decl. ¶ 12 (Chart at p. 4), DE #95.  The transaction histories for the commercial loans confirm that plaintiffs deducted the foregoing amounts from the outstanding principal loan balances.  <u>See</u> Comfort Term Loan Report at 2, DE #95-3 (showing application of four Ally Recovery Payments of $39,285.71 each against

32

the outstanding principal balance); Route 206 Term Loan Report at 2, DE #95-1 (showing application of three Ally Recovery Payments of $17,857.14 each against the outstanding principal balance).  Again, plaintiffs have substantiated their damages under the commercial loans and have, in addition, further decreased the unpaid principal based on additional monies that plaintiffs recovered, in amounts that defendants have not challenged and that are accepted by the Court.

In short, plaintiffs have demonstrated their entitlement to $2,160,714.41 under the Comfort Commercial Loan ($3,300,000 − ($982,142.75 + $157,142.84) = $2,160,714.41) and $1,053,571.50 under the Route 206 Commercial Loan ($1,500,000 − ($392,857.08 + $53,571.42) = $1,053,571.50).  Accordingly, the Court recommends awarding plaintiffs $3,214,285.91 in commercial loan principal balances.

### ii.     *Unpaid Accrued Interest*

Plaintiffs request that the Court award them unpaid accrued interest in the amounts of $75,378.23 under the Route 206 Commercial Loan and $144,841.64 under the Comfort Commercial Loan.  See Keeler Supp. Decl. ¶ 12 (Chart at p. 5), DE #95.  In support of this request, plaintiffs rely on the transaction history for each commercial loan, as well as the payment invoices that plaintiffs mailed to defendants, which set forth the principal balance and interest owed for a particular billing period.  See Comfort Term Loan Report at 2, DE #95-3 (showing unpaid interest owed in "Column J"); Route 206 Term Loan Report at 2, DE #95-1 (same); see generally Route 206 Past Due Loan Invoices (docketed on June 21, 2022), DE #95-2 (reflecting the unpaid interest amounts listed in DE #95-1); Comfort Past Due Loan Invoices (docketed on June 21, 2022) ("Comfort Commercial Loan Invoices"), DE #95-4

(reflecting the unpaid interest amounts listed in DE #95-3).  Indeed, these business records mirror the interest amounts requested by plaintiffs in their papers.[23]  But crucially, in contrast to their showings in connection with the IFSAs, plaintiffs have failed to provide a detailed explanation or even an illustrative example of the underlying calculation method used to arrive at the individual interest charges reflected in the foregoing commercial loan transaction histories.  Cf. WBS Guide, DE #95-13 (providing explanation and example of interest calculation for a particular billing period under the Comfort IFSA).  This is a material omission; the default interest owed by defendants cannot be readily determined because the default interest rates of the Route 206 Commercial Loan and the Comfort Commercial Loan are dynamic and fluctuate over time based on the 1-M LIBOR Index Rate.[24]  See Comfort Commercial Loan § III.C.1.c, DE #84-5; Route 206 Commercial Loan § III.C.1.c, DE #84-11.  In addition, unlike the wholesale billing statements for the IFSAs, the commercial loan invoices do not provide enough information for the Court to verify that the interest amounts listed therein are accurately calculated based on the enumerated interest rates, let alone confirm that the interest rates themselves are correct.  See, e.g., Route 206 Past Due Loan Invoices at 2, DE #95-2 (listing the interest in March 2020 invoice as $9,789.44 for the principal balance of $1,053,571.50 at a 11.15 percent interest rate, without further explanation).  "[T]he Court

---

[23] For example, in the Supplemental Declaration of Michael Keeler, the "outstanding" interest owed under the Route 206 Commercial Loan is listed as $75,378.23, see Keeler Supp. Decl. ¶ 12 (Chart at p. 5), DE #95 (summary chart of requested interest), and the transaction history for the same shows six transaction entries (purportedly representing the accrued and unpaid interest) totaling $75,378.23, see Route 206 Term Loan Report at 2, DE #95-1.

[24] While the two commercial loans include sections that generally outline the accrual and computation of interest, see, e.g., Comfort Commercial Loan § III.C.2, plaintiffs have nevertheless failed to explain their calculations and the Court declines to accept at face value their conclusory assertions of interest owed or to carry what is plaintiffs' burden of proof.

therefore has no confidence in the accuracy of either the interest [rate assessed] or the total amount of interest requested." U.S. Bank Nat'l Ass'n, as Tr. for RMAC Tr., Series 2016-CTT v. Swezey, 20-CV-91 (FB) (RLM), 2022 WL 1422841, at *9 (E.D.N.Y. Mar. 24, 2022) ("Swezey") (collecting cases and recommending denial of plaintiff's request for contractual interest where the interest rate was dynamic, and plaintiff failed to provide a detailed explanation of how the interest requested was determined using the unspecified dynamic rate), adopted, 2022 WL 2390989 (E.D.N.Y. July 1, 2022).

Moreover, it is not the Court's role to act as a green-eyeshade accountant, especially where, as here, plaintiffs have twice been directed to supplement their submissions to demonstrate their entitlement to the requested damages, which, in all, total more than $11 million, exclusive of attorneys' fees. See 2/7/22 Scheduling Order at 2, DE #82 ("plaintiffs must identify *and explain how* they arrived at the interest and late charges claimed, including *how* they calculated those items" (emphasis added)); 5/24/22 Scheduling Order (plaintiffs must "provide a *detailed explanation* of their calculations of the . . . accrued interest" (emphasis added)). "When the Court asked for clarification as to how [p]laintiffs calculated the interest requested . . . , the Court expected [p]laintiffs to provide documentation clearly showing, *inter alia*, the term over which interest was calculated, the number of periods (*i.e.,* the number of months) during which interest compounded, the interest rate applied, and, using those variables, a final interest amount." Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Coop. Pension & Welfare Funds v. L & P Interiors, Inc., No. CV 14–3316(JS)(AKT), 2015 WL 5562316, at *11 (E.D.N.Y. Aug. 14, 2015) ("L & P Interiors"), adopted, 2015 WL 5562340 (E.D.N.Y. Sept. 18, 2015).

Accordingly, since plaintiffs have not provided the requested information, the Court declines to recommend that plaintiffs' request for $220,219.87 in interest under the commercial loans be awarded.  See, e.g., id. (recommending that no prejudgment interest be awarded due to the plaintiffs' failure to provide the requested clarifications regarding interest calculations); Transatlantic Auto Grp., Inc. v. Unitrans-Pra Co., No. 08 CV 5070(DLI), 2011 WL 4543877, at *17 (E.D.N.Y. Sept. 9, 2011) (declining to award interest where plaintiffs "provided no explanation for the change in rates and methodology used to calculate interest"), adopted, 2011 WL 4543838 (E.D.N.Y. Sept. 29, 2011); Swezey, 2022 WL 1422841, at *9; accord Louis Hornick & Co. v. Darbyco, Inc., 12cv5892 (VSB) (DCF), 2015 WL 13745787, at *1 (S.D.N.Y. Aug. 19, 2015) (recommending that the plaintiff's damages request be denied, in part, because the plaintiff failed to provide adequate explanation of its damages request, despite a prior court order "describ[ing] the inadequacy of [p]laintiff's submissions" and "specifically direct[ing p]laintiff to supplement its inquest submissions so as to show the bases for its damages calculations (and expressly warn[ing p]laintiff of the potential consequences of failing to meet its burden in this regard)"), adopted, 2015 WL 9478239 (S.D.N.Y. Dec. 29, 2015).

### iii.    Unpaid Late Fees

As for unpaid late fees, plaintiffs contend that defendants are liable for $3,345.51 in late fees incurred under the Comfort Commercial Loan only.  See Keeler Supp. Decl. ¶ 12 (Chart at p. 5), DE #95.  Under the Comfort Commercial Loan, as noted supra, Ally Bank may "assess a late charge for any payment not received on or before the tenth calendar day of the month for which the payment is due in the amount of 3.00% of the past due payment[.]" Comfort Commercial Loan § III.K.1.a, DE #84-5.  Yet, plaintiffs have not explained, nor is it

readily apparent, how the two late charges in the separate amounts of $1,677.99 and $1,667.52 (as reflected in DE #95-3) were calculated—i.e., upon which overdue amounts the 3.00 percent late charge was assessed.  See generally Keeler Decl., DE #84-2; Keeler Supp. Decl., DE #95.  While plaintiffs have provided 'invoices for the Comfort Commercial Loan, only one of the two late charges allegedly incurred by Comfort can even be confirmed by said invoices. See Comfort Commercial Loan Invoices at 14, DE #95-3 (showing one late charge for $1,677.99 without explanation of the calculation method used).  Thus, for the same reasons set forth in the preceding subsection, the Court recommends that plaintiffs' request for $3,345.51 in late charges be denied.  See, e.g., L & P Interiors, 2015 WL 5562316, at *11; Swezey, 2022 WL 1422841, at *9; Louis Hornick & Co., 2015 WL 13745787, at *1.

## IV.    Attorneys' Fees and Costs

Plaintiffs request $550,068.79 in attorneys' fees and costs, pursuant to the terms of the financing agreements.  See Keeler Decl. ¶¶ 7, 30, 58, 65, DE #84-2; Declaration of Andrew L. Buck, Troutman Associate (Feb. 28, 2022) ("Buck Decl.") ¶¶ 8, 13, DE #84-37.  "In a diversity case [such as this one], the question [of] whether to award attorneys' fees is governed by state law."  Precise Leads, Inc. v. Nat'l Brokers of Am., Inc., CIVIL ACTION NO. 18 Civ. 8661 (RA) (SLC), 2020 WL 736918, at *6 (S.D.N.Y. Jan. 21, 2020) (collecting cases), adopted as modified, 2020 WL 729764 (S.D.N.Y. Feb. 13, 2020).  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action on the contract is enforceable 'if the contractual language is sufficiently clear.'"  Cty. of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs., L.P., 636 F.Supp.2d 159, 179 (N.D.N.Y. 2009) (quoting NetJets Aviation Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175

(2d Cir. 2008)), aff'd, 391 F.App'x 3 (2d Cir. 2010). If the contract so provides, the "court must order the losing party to pay the amount actually incurred by the prevailing party, 'so long as those amounts are not unreasonable.'" Id. (quoting F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1263 (2d Cir. 1987)). In addition, "[a]ttorneys' fees must be 'documented by contemporaneously created time records that specify, for each [timekeeper], the date, the hours expended, and the nature of the work done.'" Id. (quoting Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998)). Here, all of the financing agreements between the parties contain specific provisions that clearly permit plaintiffs to recover attorneys' fees and other legal expenses from defendants. See Comfort Commercial Loan § III.N, DE #84-5; Comfort IFSA § III.B.5, DE #84-3; Route 206 IFSA § III.B.5, DE #84-9; Route 206 Commercial Loan § III.N, DE #84-11.

Where, as here, an award of fees is authorized by contract, "the Court must [nevertheless] assess whether the fees claimed are reasonable." 56 Willoughby A LLC v. Zhang, 20-CV-3973-CBA-SJB, 2021 WL 3622084, at *9 (E.D.N.Y. July 27, 2021) (citation omitted), adopted, 2021 WL 3617671 (E.D.N.Y. Aug. 16, 2021). To determine an appropriate award of attorneys' fees, the Court must ascertain the "presumptively reasonable fee" for the legal services rendered—i.e., "what a reasonable client would be willing to pay" for representation. Masino v. Columbus Constr. Corp., No. 08–CV–1592 (RRM)(CLP), 2009 WL 2566956, at *6 (E.D.N.Y. Aug. 19, 2009) (citing Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections, 522 F.3d 182, 183-84 (2d Cir. 2008)). "To calculate the presumptively reasonable fee, a court must first determine a reasonable hourly rate for the legal services performed" by assessing certain

factors, such as the labor and skill required, the difficulty of the legal questions, the attorneys'

customary rates, the amount at stake, and awards in similar cases.  Id. at *6-7 (citing Arbor

Hill, 522 F.3d at 186-87 n.3).  Under the so-called "forum rule," the Court should also

consider the rates generally charged in its own district.  See Simmons v. N.Y.C. Transit

Auth., 575 F.3d 170, 174-76 (2d Cir. 2009).  Once a court has determined the reasonable

hourly rate, it must then multiply that rate by the reasonable number of hours expended.  See

Masino, 2009 WL 2566956, at *7-8.  This standard applies not only to cases involving

statutory fee-shifting, but also to those in which fees are authorized by contract.  See, e.g., 56

Willoughby A LLC, 2021 WL 3622084, at *9 (employing Arbor Hill analysis); RJ Kitchen

Assocs. Inc. v. Skalski, 16-1436 (LDH) (AKT), 2019 WL 2436092, at *7 (E.D.N.Y. Feb. 25,

2019) (same).

### A.    Reasonable Hourly Rate

Plaintiffs seek attorneys' fees for 14 timekeepers to be calculated at the following

hourly rates: Christina E. Bazzano ($185), Andrew L. Buck ($439.76), Brett D. Goodman

($658.85), Stayce M. Harris ($340), Sarah Harris-Finkel ($196.08), John C. Lynch ($481.56),

Jason E. Manning ($420), John C. Murphy ($243.33), Jeannie Ngai ($275), Allison J.

Ordonez ($225), Alicia M. Rountree ($180), Patrick M. Ryan ($432.64), Stephen J. Steinlight

($340), and Victor E. Webster-Beckles ($110).  See Buck Decl. ¶ 8 (Chart), DE #84-37.[25]

Plaintiffs initially failed to provide any background information whatsoever for all but four of

these timekeepers.  See generally id.  Having been instructed by this Court to supplement their

inadequate request for attorneys' fees, plaintiffs later provided biographies with varying levels

---

[25] The Buck Declaration includes a chart listing all timekeepers and, without explanation, a "Blended Rate" corresponding to each one.  See Buck Decl. ¶ 8 (Chart), DE #84-37.

of detail for each timekeeper.  See generally 5/24/22 Scheduling Order; Declaration of Bennet

J. Moskowitz, Troutman Partner (June 21, 2022) ("Moskowitz Decl."), DE #94.  At the

outset, the Court notes that most of the foregoing hourly rates exceed those typically awarded

in the Eastern District of New York.  See Pogodin, 2020 U.S. Dist. LEXIS 173999, at *25-

26.  Based on this supplemental information, and the relevant caselaw, the Court recommends

awarding hourly rates for these timekeepers, as set forth below.

### i.   *Partners/Counsel*

Brett D. Goodman, Jason E. Manning, and John C. Lynch are all current or former

partners of the law firm representing plaintiffs: Troutman Pepper Hamilton Sanders LLP

("Troutman").  See Moskowitz Decl. ¶¶ 4, 5(c), (f)-(g), DE #94.  "Recent opinions issued by

courts within the Eastern District of New York have found reasonable hourly rates to be

approximately $300-$450 for partners[.]"  Pogodin, 2020 U.S. Dist. LEXIS 173999, at *25-26

(collecting cases).  Notably, "[a]n hourly rate of $450 remains within the range of rates found

reasonable for partners with twenty or more years of experience[.]"  Nam v. Ichiba Inc., 19-

cv-1222(KAM), 2021 WL 878743, at *10 (E.D.N.Y. Mar. 9, 2021) (citation omitted).

Mr. Manning graduated *magna cum laude* from Notre Dame Law School and has more

than 16 years of experience, whereas Mr. Goodman obtained his law degree from New York

Law School and has somewhat more than 16 years of experience.  See Moskowitz Decl. ¶

5(g), DE #94 (providing that Mr. Manning has "several years" beyond 16 years of

experience); id. ¶ 5(c) (representing that Mr. Goodman became an associate in September

2006 after graduating from law school).  For their work on this case, Mr. Manning billed at a

rate of $420 per hour and Mr. Goodman charged $658.85 per hour.  See Buck Decl. ¶ 8

(Chart), DE #84-37.  Although at the higher end, Mr. Manning's requested hourly rate is within the typical range for partners with his credentials and experience level; thus, the Court recommends awarding him $420 per hour.

Mr. Goodman's requested hourly rate, on the other hand, is unreasonably high.  "Such high rates of compensation are properly 'reserved for expert trial attorneys with extensive experience before the federal bar,' who are specialists 'recognized by their peers as leaders and experts in their field.'"  Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, CV 10-2262 (DRH)(AYS), 2019 WL 2870721, at *6 (E.D.N.Y. June 18, 2019) (citation omitted), adopted, 2019 WL 2869150 (E.D.N.Y. July 3, 2019).  Nothing about Mr. Goodman's background (as detailed in one short paragraph) warrants such a generous hourly rate, and plaintiffs have cited no caselaw to support an upward departure of approximately $200 from those rates typically awarded to partners.  See generally Buck Decl., DE #84-37; Moskowitz Decl., DE #94.  Given these considerations, the Court recommends that an hourly rate of $420 be awarded for Mr. Goodman.[26]

Having spent approximately 25 years as an attorney, Mr. Lynch has considerably more experience than either of his two colleagues; he is currently a partner at Troutman's Virginia Beach office.  See Moskowitz Decl. ¶ 5(f), DE #94.  Plaintiffs also represent that Mr. Lynch "devotes his practice to civil litigation and government enforcement matters primarily in the banking and consumer financial services industry."  Id.  The requested hourly rate for Mr. Lynch is $481.56.  See Buck Decl. ¶ 8 (Chart), DE #84-37.  Despite Mr. Lynch's foregoing

---

[26] It is worth noting that as recently as 2018, courts in this District have generally awarded $300 to $400 per hour to partners with 16 years of experience.  See Castcapa Constr., LLC v. TMB Servs. Ltd. Liab. Co., 17-CV-1023 (NGG) (SJB), 2018 WL 623546, at *3 (E.D.N.Y. Jan. 30, 2018) (collecting cases).

qualifications, this hourly rate still exceeds the usual range of fees awarded in this District for attorneys with more than 20 years' experience in matters involving breach of contract.  See, e.g., Hernandez v. Quality Blacktop Servs., Inc., 18 CV 4862 (RJD)(RML), 2021 WL 1207316, at *11 (E.D.N.Y. Mar. 30, 2021) (finding $350 per hour appropriate for an attorney with over 20 years' experience in a case that involved a breach-of-contract claim); Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFL-CIO v. Intercounty Paving Assocs. of NY, LLC, No. 19-CV-0733 (RER), 2020 WL 6826197, at *8 (E.D.N.Y. Nov. 20, 2020) (finding $390 per hour reasonable for a law firm partner with over 20 years' experience in a dispute that included a claim for breach of a collective bargaining agreement).  The Court therefore recommends that Mr. Lynch's lodestar be reduced to $450.  See, e.g., Capital One, N.A. v. Auto Gallery Motors, LLC, 2:16-CV-6534 (PKC) (SIL), 2020 WL 423422, at *4 (E.D.N.Y. Jan. 27, 2020) (awarding an hourly rate of $450 to partner with more than 20 years of experience in a case involving claims for breach of contract and fraudulent misrepresentation).

Finally, plaintiffs request an hourly rate of $340 for Stayce M. Harris, who is "counsel" at Troutman.  See Moskowitz Decl. ¶ 5(d), DE #94.  Ms. Harris is based out of the law firm's Atlanta office, where she focuses on "e-discovery and data management" and "consults with clients to develop matter-specific strategies to manage discovery in litigation, internal and governmental investigations and subpoena responses[.]"  Id.  While Ms. Harris apparently graduated from Vanderbilt University Law School in 2006, plaintiffs fail to specify when she was admitted to the bar or how many years' experience she possesses.  See id. "Because expertise is a critical factor in evaluating the reasonableness of a billing rate . . . ,

42

courts have reduced fee awards due to a lack of background information on each attorney who worked on a case[.]" Brito v. ATA Freight Line, Ltd., 20-CV-3132 (EK), 2021 WL 7830146, at \*10 (E.D.N.Y. Aug. 24, 2021) (internal citations omitted). The Court therefore recommends a $300 hourly rate for Ms. Harris.

### ii.   Associates

Courts in the Eastern District of New York generally award junior associates an hourly rate of $100 to $200, whereas senior associates are typically awarded $200 to $325 per hour. See Pogodin, 2020 U.S. Dist. LEXIS 173999, at \*25-26. Here, three associates with varying levels of seniority performed work on this case. First is Stephen J. Steinlight, an associate in Troutman's New York office with "nearly two decades of experience as a trial and appellate litigator in federal and state courts and arbitrations in an expansive range of complex business, commercial, corporate, real estate, banking, financial services, consumer finance, securities industry/broker-dealer, white-collar/regulatory, ERISA, and labor and employment matters." Moskowitz Decl. ¶ 5(m), DE #94. The hourly rate that plaintiffs seek to recover for his work is $340. See Buck Decl. ¶ 8 (Chart), DE #84-37. While Mr. Steinlight's litigation experience certainly spans a broad range of practice areas, plaintiffs have provided no specific details regarding the number of cases that Mr. Steinlight has litigated, nor have they elaborated upon his expertise in the type of contract dispute at issue here, or other complex finance-related litigation. See id. Without more, the Court cannot recommend a rate in excess of the reasonable range usually approved by courts in this District, and it instead recommends awarding fees for Mr. Steinlight's work at $325 per hour—the upper limit of hourly rates for senior associates. See, e.g., 56 Willoughby A LLC, 2021 WL 3622084, at \*10 (collecting

cases and recommending hourly rate of $325 for senior associate with "nearly 30 years of practice" in breach-of-guaranty case).

Mr. Buck, for whom plaintiffs request an hourly rate of $439.76, is an associate with approximately 15 years' experience who graduated *magnum cum laude* from Cardozo School of Law.  See Buck Decl. ¶ 8 (Chart), DE #84-37; Moskowitz Decl. ¶ 5(b), DE #94.  Mr. Buck's hourly rate warrants a downward adjustment in light of the fact that $439.76 per hour almost reaches the maximum hourly rates awarded to *partners* (and far surpasses the rates awarded to senior associates).  See Culwick, 2021 WL 7906500, at *18-19 (finding that the prevailing rate of $200 to $300 per hour for senior associates in the Eastern District is also consistent with fee awards in breach-of-contract cases).  Thus, the Court recommends that Mr. Buck—one of three associates assigned to this matter—be awarded $300 per hour, a rate well within the range deemed reasonable for senior associates across a variety of types of cases. See, e.g., Pogodin, 2020 U.S. Dist. LEXIS 173999, at *27 (reducing $400 hourly rate to $325 for the sole senior associate with 15 years' experience in case with multiple defendants involving several claims for breach of contract and fraudulent inducement).

The last associate who was staffed on this matter, Patrick M. Ryan, billed plaintiffs for his work at an hourly rate of $432.64.  See Buck. Decl. ¶ 8, DE #84-37.  Mr. Ryan has seven years' experience and is therefore the least seasoned of the associate timekeepers.  See Moskowitz Decl. ¶ 5 (l), DE #94.  The Court likewise recommends an adjustment to his rate, specifically to $250 per hour.  See, e.g., Auto Gallery Motors, LLC, 2020 WL 423422, at *4 (recommending $275 hourly rate for seventh-year associate); Callari v. Blackman Plumbing Supply, Inc., CV 11-3655 (ADS) (AKT), 2020 WL 2771008, at *11 (E.D.N.Y. May 4, 2020)

(reducing hourly rate of a sixth-year associate to $200), adopted, 2020 WL 2769266

(E.D.N.Y. May 28, 2020).

>    iii.   *Support Staff*

With respect to non-attorney timekeepers, plaintiffs seek various hourly rates in excess

of $100 for the six paralegals and one "Case Clerk" involved in this litigation, ranging from

$110 to $275 per hour.  See Buck Decl. ¶ 8 (Chart), DE #84-37; Moskowitz Decl. ¶¶ 5(a),

(e), (h)-(k), (n), DE #94.  "Courts in this district have found that a range of $70 to $100 per

hour is reasonable for paralegals."  Mor USA, Inc. v. Adam Trading, Inc., 19-cv-07283

(AMD) (ST), 2021 WL 799327, at *7 (E.D.N.Y. Feb. 10, 2021) (citation omitted), adopted,

2021 WL 796061 (E.D.N.Y. Mar. 1, 2021); see Rudler v. Houslanger & Assocs., PLLC,

Case No. 18-cv-7068 (SFJ)(AYS), 2020 WL 473619, at *12 (E.D.N.Y. Jan. 29, 2020)

(collecting cases).  "One hundred dollars per hour is the appropriate rate for those [support

staff] with significant experience, while an hourly rate of $70 [is] appropriate for those with

less or minimal experience."  C.A. v. N.Y.C. Dep't of Educ., 20 Civ. 2101 (AMD) (VMS),

2022 WL 673762, at *6 (E.D.N.Y. Feb. 16, 2022) (collecting cases) (internal quotation marks

omitted), adopted, 2022 WL 673272 (E.D.N.Y. Mar. 7, 2022).

The Court recognizes that some of the paralegals have considerable experience in their

field.  Plaintiffs represent that Sarah Harris-Finkel, John C. Murphy, Jeannie Ngai, and

Allison J. Ordonez each have 20 or more years of experience working as a paralegal.  See

Moskowitz Decl. ¶¶ 5(e), (h)-(j), DE #94.  Nevertheless, the requested hourly rates of

between $196.08 and $275 for these particular paralegals are nearly double to triple what is

typically awarded for support staff with comparable experience.  See Buck Decl. ¶ 8 (Chart),

DE #84-37; Rudler, 2020 WL 473619, at *12.  Again, plaintiffs cite no caselaw to support a

rate that exceeds the typical range.  See generally Buck Decl., DE #84-37; Moskowitz Decl.,

DE #94.  Further, in another case filed in this District, a Troutman paralegal—Ms. Harris-

Finkel—was recently awarded an hourly rate of $100 based expressly on her 20 years of

experience.  See Agudath Israel of Am. v. Hochul, No. 20-cv-04834 (KAM)(RML), 2021 WL

5771841, at *7 (E.D.N.Y. Dec. 6, 2021).  Accordingly, the Court recommends decreasing the

hourly rates for Ms. Harris-Finkel, as well as for her fellow Troutman paralegals with 20 (or

more) years' experience, to $100.  See, e.g., id. (reducing Troutman paralegal's hourly rate

from $275 to $100 where she was the sole paralegal); see also Gesualdi v. Burtis Constr. Co.,

CV 20-4864 (ARR) (ARL), 2021 WL 6550952, at *5 (E.D.N.Y. Dec. 28, 2021)

(recommending reduction of hourly rate for paralegal with more than 20 years of experience

from $120 to $100 per hour in ERISA case), adopted, 2022 WL 173548 (E.D.N.Y. Jan. 19,

2022).

Other paralegal timekeepers possess significantly less experience; specifically, Christina

E. Bazzano and Alicia M. Rountree have approximately four and seven years of experience,

respectively.[27]  See Moskowitz Decl. ¶¶ 5(a), (k), DE #94.  The Court acknowledges that

these paralegals are college graduates.  See id. (representing that Ms. Bazzano earned "her

bachelor's degree from Washington and Jefferson College in 2018[,]" and that Ms. Rountree

graduated "from Christopher Newport University in 2006").  Nevertheless, these credentials,

without more, do not justify the requested hourly rates.  The Court therefore recommends

---

[27] Plaintiffs' representations regarding Ms. Bazzano are ambiguous as to whether or not she began working as a
legal assistant and/or paralegal immediately after graduating from college in 2018.  See Moskowitz Decl. ¶ 5(a),
DE #94 (failing to specify Ms. Bazzano's total number of years of experience).

awarding $75 per hour for Ms. Bazzano and $85 per hour for Ms. Rountree, which the Court views as more appropriate given these paralegals' experience levels and the fact that five other support staff worked on this case.  See, e.g., Sooroojballie v. Port Auth. of NY & NJ, 1:15-cv-01230 (WFK)(PK), 2020 WL 6149665, at *7 (E.D.N.Y. Sept. 22, 2020) (recommending hourly rates of $80 and $70 for paralegals with six and four years of experience, respectively), adopted, 2020 WL 6146880 (E.D.N.Y. Oct. 20, 2020); cf. RJ Kitchen Assocs. Inc, 2019 WL 2436092, at *10 (awarding $100 hourly rate for sole paralegal on the case, with five years' experience).

Finally, as to Victor E. Webster-Beckles, who is designated as a "Case Clerk," plaintiffs have provided no information regarding his responsibilities or a description of his role.  See Moskowitz Decl. ¶ 5(n), DE #94.  Plaintiffs have likewise failed to address Mr. Webster-Beckles' experience level beyond his two-year tenure at Troutman.  See id.  Thus, the Court is unable to endorse an hourly rate of $110 for Mr. Webster-Beckles and instead recommends $70 per hour, which comports with the hourly rates typically awarded in this District for support staff members with similar experience.  See, e.g., C.A., 2022 WL 673762, at *6 (awarding hourly rates between $70 and $80 for paralegals and legal assistants with three to four years of experience); Auto Gallery Motors, LLC, 2020 WL 423422, at *4 (finding plaintiff's "request for an hourly rate of $75 for . . . case assistants to be reasonable" (citation omitted)).

## B.    Reasonable Hours Expended

"The next step [in the lodestar analysis] is to determine the reasonableness of the hours expended by counsel."  Feltzin v. Union Mall LLC, 393 F.Supp.3d 204, 211 (E.D.N.Y.

2019) (citation omitted).  Here, plaintiffs seek attorneys' fees for 1,238.80 hours of work performed by their counsel and staff.  See Buck Decl. ¶ 8 (Chart), DE #84-37.  Plaintiffs' counsel has submitted more than 200 pages of client invoices, which include time records setting forth each timekeeper's name (and/or initials), as well as the dates, descriptions, and number of hours of work performed.  See generally Troutman Client Invoices (Feb. 28, 2022) ("Troutman Invoices"), DE #84-38.  In his sworn declaration, Andrew L. Buck—a Troutman associate—avers that these invoices are true and correct copies, which contain contemporaneous time records.  See Buck Decl. ¶ 9, DE #84-37.  The vast majority of the hours set forth in these contemporaneous time records are purportedly attributable to the following attorney timekeepers (who, notably, also have the highest hourly rates): Andrew L. Buck (566.30 hours),[28] Stephen J. Steinlight (266.80 hours), John C. Lynch (72.10 hours), and Brett D. Goodman (213.40 hours).  See id. ¶¶ 8, 10-11.  Mr. Buck states that the time spent on this matter by the additional 10 timekeepers "account[s] for $33,073.00 (approximately 6%) of the fees billed by Troutman to the Ally Parties[.]"  Id. ¶ 12.

### i.    Work Performed on Related Matters

As an initial matter, the Court addresses plaintiffs' entitlement to attorneys' fees for work performed in other related actions.  In his declaration, Mr. Buck indicates that the requested attorneys' fees are for work performed in the instant federal action, as well as for time spent litigating a related state court action filed in New York Supreme Court, Kings County, and a Chapter 11 bankruptcy action filed in the U.S. Bankruptcy Court for the Eastern

---

[28] There is a discrepancy in the Buck Declaration concerning the number of hours attributable to Mr. Buck. Compare Buck Decl. ¶ 8 (Chart), DE #84-37 (566.30 hours), with id. ¶ 10(c) (556.30 hours).  Based on plaintiffs' calculations of his lodestar, see id. ¶ 8 (Chart), the lower number appears to be incorrect.

District of New York.  See Buck Decl. ¶ 7, DE #84-37; id. ¶ 8 ("Troutman's Accounting

Department prepared the following chart describing the fees billed by Troutman to the Ally

Parties for Troutman's work related to enforcement of the Ally Parties' contractual rights

against the Defendants . . . , *including* prosecution of the instant civil action from the inception

of our representation through January 31, 2022" (emphasis added)).  Indeed, a review of the

client invoices reveals time entries for work on the related actions.  See, e.g., Troutman

Invoices at 53, DE #84-38 (July 26, 2020 time entry stating: "Prepare for and participate in

call with clients regarding Comfort bankruptcy filing and related strategy").  In a contract case

such as this, "attorneys' fees that may be shifted are limited to the specific scope of the fee-

shifting provision in that contract." Viber Media S.à r.l. v. NxtGn, Inc., No. 18-cv-618

(RJS), 2020 WL 3182906, at *5 (S.D.N.Y. June 15, 2020) (collecting cases).

 The relevant language in the parties' financing agreements is broad enough to

encompass those fees incurred by plaintiffs in the state court action and related to the

bankruptcy action.  Specifically, the IFSAs provide that the:

> Dealership must pay all expenses and reimburse each of the Ally Parties for any
> cost, expense, or other expenditures, including reasonable attorney fees and
> legal expenses; amounts expended by the Ally Parties on behalf of Dealership;
> collection and bankruptcy costs, fees and expenses; and all other amounts
> incurred by each of the Ally Parties *in the enforcement of any right or remedy,*
> *collection of any Obligation . . . , or defense of any claim or action in respect of*
> *this Agreement*.

Comfort IFSA § III.B.5, DE #84-3 (emphasis added); Route 206 IFSA § III.B.5, DE #84-9

(emphasis added).  The commercial loan agreements include similar provisions requiring

payment of attorneys' fees.  One such provision states that: "Any sums expended by [Ally]

Bank in enforcement of its rights and remedies, including, *without limitation*, attorney and

other legal fees, will be immediately due and payable and will be part of the Loan and subject

to all the Loan Documents." Comfort Commercial Loan § III.K.5, DE #84-5 (emphasis

added); Route 206 Commercial Loan § III.K.5, DE #84-11 (emphasis added). Accordingly,

the Court may properly award attorneys' fees for those hours expended in the related actions.[29]

See, e.g., SourceCode Commc'ns LLC, 2022 WL 1946260, at *7 (concluding that the contract

at issue was sufficiently broad to permit plaintiff to recover attorneys' fees for time spent on

pre-litigation matters, such as collection attempts); Bank of Am., N.A. v. Brooklyn Carpet

Exch., Inc., 15cv5981 (LGS) (DF), 2016 WL 8674686, at *9 (S.D.N.Y. May 13, 2016)

(recommending that plaintiff be awarded attorneys' fees for work related to pre-litigation

efforts to obtain satisfaction of defendant's debt where defendant "agreed to reimburse

[p]laintiff for the reasonable attorneys' fees and costs incurred in connection with any effort to

enforce its contract rights"), adopted, 2016 WL 3566237 (S.D.N.Y. June 27, 2016); Sidley

Holding Corp. v. Ruderman, No. 08 Civ. 2513(WHP)(MHD), 2009 WL 6047187, at *18

(S.D.N.Y. Dec. 30, 2009) (concluding that contractual attorneys' fees provision required the

defendant to pay fees incurred in connection with both federal litigation and related state court

action), adopted, 2010 WL 963416 (S.D.N.Y. Mar. 15, 2010); Easterly v. Tri-Star Transp.

Corp., 11 Civ. 6365(VB)(PED), 2014 U.S. Dist. LEXIS 180999, at *24 (S.D.N.Y. Nov. 19,

2014) (court awarded plaintiff attorneys' fees for time spent related to "the bankruptcy of

individual defendants" in a case involving claims for breach of contract and FLSA claims),

---

[29] The time spent by plaintiffs' counsel in connection with the related actions may be considered by the Court regardless of the fact that plaintiffs voluntarily dismissed the state court action and that the bankruptcy action was ultimately dismissed. See SourceCode Commc'ns LLC v. In-telligent LLC, 21-CV-10519 (VSB) (RWL), 2022 WL 1946260, at *7 (S.D.N.Y. May 25, 2022) ("A prevailing party can recover fees for several categories of work, including failed efforts otherwise reasonably pursued." (collecting cases)).

adopted, 2015 U.S. Dist. LEXIS 7970 (S.D.N.Y. Jan. 23, 2015); cf. Wells Fargo Bank, N.A.

v. Nat'l Gasoline, Inc., No. 10–CV–1762 (RER), 2013 WL 1822288, at *13 (E.D.N.Y. Apr.

30, 2013) (after "narrowly reading the relevant fees provisions" in the disputed agreements,

the court limited plaintiff's fee award to only those hours spent on the federal case before it,

reasoning that the related actions were "not the type of cases anticipated by those

agreements"), aff'd, 577 F.App'x 58 (2d Cir. 2014).

### ii.    *Deficiencies in the Time Records*

The Court next considers the reasonableness of the hours of work for which plaintiffs

seek recovery.  "When considering an application for attorneys' fees, the Court should exclude

'excessive, redundant, or otherwise unnecessary' hours."  Dominic Schindler Holding, AG v.

Moore, 20 Civ. 4407 (RPK) (VMS), 2022 WL 987428, at *9 (E.D.N.Y. Jan. 12, 2022)

(quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  "[I]n dealing with such

surplusage, the court has discretion simply to deduct a reasonable percentage of the number of

hours claimed 'as a practical means of trimming fat from a fee application.'"  Rosen v. LJ

Ross Assocs., Inc., 19 Civ. 5516 (ARR) (VMS), 2022 WL 493728, at *6 (E.D.N.Y. Jan. 24,

2022), adopted, 2022 WL 493274 (E.D.N.Y. Feb. 17, 2022); see Raja v. Burns, –4th–, 2022

WL 3022527, at *4 (2d Cir. Aug. 1, 2022); Ortiz v. City of N.Y., 843 F.App'x 355, 360 (2d

Cir. 2021).  "Likewise, if claimed hours are insufficiently documented, the court may decrease

the award, either by eliminating compensation for unreasonable hours or by making across-the-

board percentage cuts in the total hours for which reimbursement is sought."  Auto Gallery

Motors, LLC, 2020 WL 423422, at *2 (internal quotation marks and citation omitted).

Having reviewed plaintiffs' counsel's time records, the Court has identified numerous ambiguous and/or vague time entries, as well as instances of block-billing (and frequently a combination of both infirmities).  For example, many of Mr. Goodman's time entries contain opaque descriptions that make it challenging for the Court to discern exactly what work he performed, particularly those descriptions simply referring to "various work" and "situations." See, e.g., Troutman Invoices at 13, DE #84-38 (February 18, 2020 time entry for "Call with P. Adler regarding Comfort situation and follow-up with A. Buck"); id. at 22 (March 11, 2020 time entry for "Call with P. Adler regarding Comfort situation"); id. at 20 (March 5, 2020 time entry for "Various work and internal discussions on federal court complaint and action[,]" with no description of what "various work" denotes); id. at 141 (nine different time entries indicating time spent by a paralegal "analyz[ing]" court orders, without further explanation of what this analysis involved).

Further, Troutman's time records are replete with block-billing, which "makes it difficult if not impossible for [the Court] to determine the reasonableness of the time spent on each of the individual services or tasks provided." Marshall v. Deutsche Post DHL, No. 13–CV–1471 (RJD)(JO), 2015 WL 5560541, at *12 (E.D.N.Y. Sept. 21, 2015) (collecting cases). By way of example, there is an April 29, 2020 time entry for 4.8 hours for Mr. Buck, which reads as follows: "Participate in calls with client regarding vehicle recovery strategies; draft amended complaint"; because these tasks are lumped together, the Court has no way of knowing or estimating how much time was spent on the client calls versus drafting.  Troutman Invoices at 30-31, DE #84-38; see also id. at 36 (single time entry for Patrick M. Ryan for 4.8 hours including research and analysis, drafting written analysis, and internal conferencing); id.

at 12-13 (multiple examples of entries for John C. Murphy that aggregate three or more distinct tasks into one billing entry).  Given the foregoing issues, and the voluminous nature of the proffered invoices, the Court recommends applying a 15 percent "across-the-board" reduction to counsel's compensable hours.  See, e.g., SourceCode Commc'ns LLC, 2022 WL 1946260, at *8 (recommending 10 percent across-the-board reduction for block-billing and ambiguous time entries); Sooroojballie v. Port Auth. of NY & NJ, 15-cv-1230 (WFK) (PK), 2021 WL 1827116, at *3 (E.D.N.Y. May 7, 2021) (adopting magistrate's recommendation of 15 percent reduction in counsel's hours due to vague and excessive time entries); Dagostino v. Computer Credit, Inc., 238 F.Supp.3d 404, 417-18 (E.D.N.Y. 2017) (block-billing and excessive time entries warranted 15 percent reduction); see also Auto Gallery Motors, LLC, 2020 WL 423422, at *5 ("It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate." (citations omitted)).

### iii.   Inefficient Staffing

Moreover, the number of attorneys and support staff assigned to the litigation—three partners, one counsel, three associates, and seven support staff—is somewhat excessive. "While the use of multiple attorneys is not per se unreasonable, courts should consider the number of attorneys assigned to staff particular matters or events in awarding attorneys' fees." Hice v. Lemon, 19-cv-4666 (JMA)(SIL), 2022 WL 1407593, at *7 (E.D.N.Y. Mar. 23, 2022) (internal quotation marks and citations omitted); see Centro de la Comunidad Hispana de Locust Valley, 2019 WL 2870721, at *7 ("[A] district court can reduce the requested award where the prevailing party assigned an inordinate number of attorneys to litigate the action."

(internal quotation marks and citation omitted)).  The proffered Troutman time records contain

multiple entries suggestive of duplicative work, which in turn indicate overstaffing and

inefficient litigation of the case.  See, e.g., Troutman Invoices at 198, DE #84-38 (entries for

timekeepers Lynch, Steinlight, and Rountree all reviewing or analyzing Judge Brodie's order

dismissing defendants' counterclaims); id. at 101 (entries for Mr. Buck and Mr. Goodman

expending time preparing pre-motion letter, as well as four separate time entries for Mr. Buck

"discuss[ing] same with [Mr.] Steinlight"); id. at 74 (partner, associate, and paralegal

spending multiple hours attending to and preparing deposition notices); id. at 37 (Mr. Buck's

5/11/20 time entry for internal conference call with two partners and one associate *and* follow-

up discussions regarding the same matter with the same associate).

        In addition, certain time entries reveal the inefficient use of counsel's time.  See, e.g.,

id. at 11, 12, 74, DE #84-38 (time entries for Mr. Buck, an associate, "coordinat[ing]" the

service of multiple filings, a task also performed by Troutman paralegals in other instances);

id. at 29 (Mr. Buck billing time for "updat[ing] calendar" to include a new response deadline

on April 10, 2020); id. at 198 (multiple time entries for Mr. Steinlight, a senior associate, and

Ms. Rountree, a paralegal, "analyz[ing]" court orders).   "[W]here counsel seeks compensation

for time spent completing administrative tasks or work that should have been accomplished by

a less-skilled practitioner, '[u]niform percentage cutbacks are warranted.'"  Kizer v.

Abercrombie & Fitch Co., CV 12-5387 (JS) (AKT), 2017 WL 9512408, at *4 (E.D.N.Y. July

24, 2017) (collecting cases), adopted, 2017 WL 3411952 (E.D.N.Y. Aug. 9, 2017).

Consequently, the Court recommends that the number of hours claimed be reduced by an

additional 10 percent, which is in line with other reductions imposed in this Circuit for similar

deficiencies.  See, e.g., King v. N.Y.C. Emps. Ret. Sys., 13 CV 4730 (JBW)(LB), 2017 U.S.

Dist. LEXIS 5521, at *17-18 (E.D.N.Y. Jan. 12, 2017) (20 percent reduction for

overstaffing), adopted, 2017 U.S. Dist. LEXIS 51976 (E.D.N.Y. Apr. 3, 2017); Barkley v.

United Homes, LLC, Nos. 04-CV-875 (KAM), 2012 WL 3095526, at *10-11 (E.D.N.Y. July

30, 2012) (reducing the number of overall hours by 25 percent due to overstaffing, duplicative

work, and excessive time spent), aff'd sub nom. Barkley v. Olympia Mortg. Co., 557 F.App'x

22 (2d Cir. 2014); Lochren v. Cty. of Suffolk, 344 F.App'x 706, 709 (2d Cir. 2009)

(affirming 25 percent reduction "because plaintiffs overstaffed the case, resulting in the

needless duplication of work and retention of unnecessary personnel"); see also Hop Hing

Produces Inc. v. X & L Supermarket, Inc., No. CV 2012–1401(ARR)(MDG), 2013 WL

1232919, at *7 (E.D.N.Y. Mar. 4, 2013) (reducing requested fees by 15 percent for

"excessive time spent on conferences between attorneys"), adopted, 2013 WL 1232483

(E.D.N.Y. Mar. 27, 2013); Allende v. Unitech Design, Inc., 783 F.Supp.2d 509, 515

(S.D.N.Y. 2011) (reducing fee award by 7 percent, to account for "some duplicative billing

for conferences" among attorneys); accord Datiz v. Int'l Recovery Assocs., Inc., CV 15-3549

(DRH) (AKT), 2020 WL 5899881, at *12 (E.D.N.Y. Mar. 12, 2020) ("The redundant internal

consultations, overstaffing, and duplicative work reflected in the billing records warrant a

sizable reduction of the hours billed in this action."), adopted, 2020 WL 3790348 (E.D.N.Y.

July 7, 2020).

In sum, the Court recommends an overall 25 percent reduction in plaintiffs' counsel's

hours.  See, e.g., Kizer, 2017 WL 9512408, at *12-13 (collecting cases and finding "25%

across-the-board reduction in the total hours claimed [was] warranted" due to counsel's block-

billing and excessive, duplicative, and otherwise unwarranted time entries). Such a reduction

is amply warranted, given the excessive number of hours billed, coupled with counsel's myriad

omissions.

Multiplying the adjusted hourly rates set forth above by the adjusted hours expended by

each attorney, this Court calculates the recommended amount of attorneys' fees as follows:

| Position | Timekeeper | Adjusted Hourly Rate | Adjusted Number of Hours | Total Fees Per Timekeeper |
|---|---|---|---|---|
| Partners/Counsel | John C. Lynch | $450 | 54.075 | $24,333.75 |
| | Brett D. Goodman | $420 | 160.05 | $67,221 |
| | Jason E. Manning | $420 | 0.9 | $378 |
| | Stayce M. Harris | $300 | 0.45 | $135 |
| Associates | Stephen J. Steinlight | $325 | 200.1 | $65,032.50 |
| | Andrew L. Buck | $300 | 424.725 | $127,417.50 |
| | Patrick M. Ryan | $250 | 23.7 | $5,925 |
| Support Staff | John C. Murphy | $100 | 24.75 | $2,475 |
| | Jeannie Ngai | $100 | 3.375 | $337.50 |
| | Sarah Harris-Finkel | $100 | 26.775 | $2,677.50 |
| | Allison J. Ordonez | $100 | 0.3 | $30 |
| | Alicia M. Rountree | $85 | 9.15 | $777.75 |
| | Christina E. Bazzano | $75 | 0.3 | $22.50 |
| | Victor E. Webster-Beckles | $70 | 0.45 | $31.50 |
| **Total Fee Award** | | | | **$296,794.50** |

In light of the foregoing analysis, the Court recommends that plaintiffs be awarded

$296,794.50 in attorneys' fees.

**C.      Costs**

In addition to attorneys' fees, plaintiffs seek $1,927.29 for "total disbursements

billed[.]"  Buck Decl. ¶ 13, DE $84-37.  As the Court noted above, the financing agreements

permit plaintiffs to recover costs incurred in connection with this matter.  See, e.g., Comfort

IFSA § III.B.5, DE #84-3 (Comfort "must pay all expenses and reimburse each of the Ally

Parties for any cost, expense, or other expenditures"). Thus, plaintiffs are "entitled to compensation for 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" Grinblat v. H & 6 Assoc. Inc., 19-CV-2034 (LDH) (SMG), 2020 WL 7000347, at *5 (E.D.N.Y. July 10, 2020) (quoting LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998)), adopted, 2020 WL 6110826 (E.D.N.Y. Oct. 15, 2020). Nevertheless, "[t]he fee applicant bears the burden of adequately documenting and itemizing the costs requested[,]" in order for the Court to award such costs. Monge v. Glen Cove Mansion Hosp., LLC, Case No. 18-cv-7229 (SJF)(SIL), 2020 WL 1666460, at *9 (E.D.N.Y. Apr. 2, 2020) (citations omitted).

Here, plaintiffs provided no citations to the record to support an award of $1,927.29 in "disbursements," nor have they included documentation or even a breakdown of such disbursements.[30] See generally Buck Decl., DE #84-37. The Court therefore declines to recommend an award for costs that are neither documented nor identified. "The Court may, however, take judicial notice of the District's filing fee as a cost." Dominic Schindler Holding, 2022 WL 987428, at *10 (citation omitted). The docket reflects that plaintiffs paid the $400.00 filing fee for this action, see DE #1, and the Court therefore recommends that

---

[30] Having examined counsel's sprawling invoices, the Court has discovered that some scattered invoices include line items for various costs. See, e.g., Troutman Invoices at 137, DE #84-38 (client invoice denoting costs for nondescript "Filing Fees" and "Miscellaneous Expenses"). Given the unorganized nature of this documentation, it is not clear to the Court whether the costs reflected therein are in fact those comprising plaintiffs' request for almost $2,000 in "disbursements," as set forth in a single sentence in DE #84-37. Moreover, many of the descriptions for the "costs" billed to plaintiffs are extremely vague, rendering it impossible for the Court to assess whether plaintiffs would be entitled to reimbursement for said costs in the first place. See, e.g., Troutman Invoices at 16, DE #84-38 (billing $472.40 in costs for "Professional Services" without any further description). There are also costs included in the invoices that are ordinarily not recoverable, such as meal expenses. See Alcea v. City of N.Y., 272 F.Supp.3d 603, 613 (S.D.N.Y. 2017) (citing Barkley, 2012 WL 3095526, at *12). Finally, as mentioned above, plaintiffs have not provided any other supporting documentation, such as receipts, to corroborate or substantiate these expenses.

plaintiffs be awarded $400.00 in costs, but that the remainder of plaintiffs' request for

"disbursements" be denied due to plaintiffs' failure to itemize their costs, cite to the record to

identify their costs, or provide any supporting documentation beyond their counsel's firm

invoices.  See, e.g., Suriel v. Cruz, CIVIL ACTION NO.: 20 Civ. 8442 (VSB) (SLC), 2022

WL 1750232, at *18 (S.D.N.Y. Jan. 10, 2022) (taking judicial notice of $400.00 filing fee but

declining to award costs for other unsubstantiated amounts listed only in attorney billing

records), adopted, 2022 WL 1751163 (S.D.N.Y. May 31, 2022); Flanagan v. Medway

Constr. Inc., No. 15-CV-5229 (ADS)(GRB), 2018 WL 1936448, at *2 n.4 (E.D.N.Y. Feb.

22, 2018) (finding request for service-of-process costs to be inadequately documented where

plaintiffs had "not furnished a receipt or other relevant document reflecting" the requested

dollar amount), adopted, 2018 WL 1796229 (E.D.N.Y. Mar. 14, 2018); see also

Khotovitskaya v. Shimunov, 18-CV-7303 (NGG) (CLP), 2021 WL 868781, at *2 (E.D.N.Y.

Mar. 9, 2021).

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that plaintiffs be

awarded $11,326,059.37 in total damages, $296,794.50 in attorneys' fees, and $400.00 in

costs.

Any objections to this Report and Recommendation must be filed with the Honorable

Margo K. Brodie on or before September 12, 2022.  Failure to file objections in a timely

manner may waive a right to appeal the District Court's order.  See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d

Cir. 1989) (per curiam).

The Clerk is respectfully requested to docket this Report and Recommendation into the

ECF court file and to send copies to defendants at the following addresses:[31]

> Heshy Gottdiener
> 9 Wallenberg Circle
> Monsey, New York 10952
>
> Comfort Auto Group NY LLC
> 9 Wallenberg Circle
> Monsey, New York 10952
>
> Route 206 Auto Group, LLC
> 9 Wallenberg Circle
> Monsey, New York 10952

**SO ORDERED.**

**Dated:     Brooklyn, New York**
**          August 26, 2022**

/s/ **Roanne L. Mann**
**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**

---

[31] The Clerk is further requested to send electronic copies of this Report and Recommendation to defendants, via email, at: 8075973@gmail.com.